UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

---

In re:                                                Case No. 10-47910

Newport Investments, LLC,                             Chapter 11 Case

        Debtor.

---

## Notice of Hearing and Motion to Dismiss under 11 U.S.C. § 1112(b)

---

TO:    The Debtor and other entities specified in Local Rule 9013-3.

      1.    Commerce Bank, through its attorneys, moves for dismissal or conversion of this case 11 U.S.C. § 1112(b).

      2.    On Wednesday, March 2, 2011, at 10:00 a.m., in Courtroom No. 8 West, United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, the court will hold a hearing to determine whether this case should be dismissed or converted.

      3.    Any response to this motion must be in writing and must be delivered not later than Friday, February 25, 2011, which is five days before the time set for the hearing, including Saturdays, Sundays and holidays.  *See* Fed. R. Bankr. P. 9006 and Loc. R. Bankr. P. 9006-1(c).  **UNLESS A RESPONSE IS TIMELY SERVED AND FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

      4.    Newport's bankruptcy petition should be dismissed or converted for cause because: (1) Newport filed its bankruptcy petition in bad faith, and (2) cause exists under § 1112(b)(4)(A) because, first, Newport's operations are causing

"substantial or continuing loss to or diminution of the estate" and, second, Newport's stated intention to sell the property, as well as its poor cash flow situation, establishes "the absence of a reasonable likelihood of rehabilitation."

5.       This motion is supported by the accompanying declarations of Brian Mallak and Richard G. Jensen, as well as the accompanying memorandum in support of dismissal under 11 U.S.C. § 1112(b).

6.       Commerce Bank requests an order as follows:

     a.       Granting Commerce Bank's Motion to Dismiss or Convert Case

     b.       Dismissing the Chapter 11 proceeding of Newport Investments, LLC

DATED:  February 9, 2011          **FABYANSKE, WESTRA, HART & THOMSON, P.A.**

By: s/ Richard G. Jensen
     Richard G. Jensen (#18990X)
     Theodore V. Roberts (#031318X)
     800 LaSalle Ave., Suite 1900
     Minneapolis, MN  55402
     Telephone:  (612) 359-7600
     Fax: (612) 359-7602
     **ATTORNEYS FOR CREDITOR COMMERCE BANK**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                    Case No. 10-47910

Newport Investments, LLC                                  Chapter 11 Case

---

**Memorandum in Support of Dismissal Under 11 U.S.C. § 1112(b)**

---

## INTRODUCTION

The debtor is Newport Investments, LLC, a single-asset real estate entity and owner of a heavily-mortgaged apartment complex in Newport, Minnesota. The movant, Commerce Bank, is Newport's largest secured creditor. It holds a mortgage against the property in the principal amount of $2.7 million.

Newport filed its bankruptcy petition five days after a Minnesota state court granted Commerce Bank's motion to appoint a receiver over the property. Until then, Newport had represented to the state court that it intended to cure its defaults and reinstate its mortgage under Minn. Stat. § 580.30, even going so far as to file a motion asking the state court to set the terms for reinstatement. Even though the state court complied with Newport's request, Newport responded with its bankruptcy petition.

Under controlling Eighth Circuit law, this bankruptcy should be dismissed for cause on two independent grounds. First, the Eighth Circuit, along with several other circuits, has held that a Chapter 11 case should be dismissed under 11 U.S.C. 1112(b) if the petition was not filed in good faith. Second, cause exists under § 1112(b)(4)(A) because, first, Newport's operations are causing "substantial or continuing loss to or

diminution of the estate" and, second, Newport's stated intention to sell the property, as well as Newport's inability to generate any significant positive cash flow from the use of Commerce Bank's cash collateral, establishes "the absence of a reasonable likelihood of rehabilitation."

At bottom, Newport's bankruptcy is motivated by the hope of its owner, Hyder Jaweed, who would like to sell the property at a high enough price to satisfy all of Newport's debts and thus relieve Jaweed from liability under his personal guaranty. Unfortunately, this dream is kept alive only at significant cost to the courts and Newport's creditors. The principles and purposes of Chapter 11 are not being served by this case, and it should be dismissed.

## BACKGROUND FACTS

1.      Newport is a single-asset real estate entity, the owner of an apartment complex in Newport, Minnesota, containing 53 rental units. (Doc. 41 [cash collateral stipulation], Recital, ¶ H; Decl. Brian Mallak dated February 2, 2011, ¶ 2.)

2.      On June 6, 2008, Commerce Bank loaned Newport $2,969,000 to purchase the property. *Id.* The purchase price was $3,090,000. (Mallak Decl., ¶ 2.)

3.      The property is subject to Commerce Bank's mortgage lien. (Doc. 41: [cash collateral stipulation], Recitals, ¶¶ D-G; *see also* Doc. 6 [first cash collateral motion], ¶ 15; Mallak Decl., ¶ 2.)

4.      Newport's owner, Hyder Jaweed, personally guaranteed Commerce Bank's loan to Newport. (Doc. 6 [first cash collateral motion], ¶ 15.)

5.     The parties' stipulation lists the amount of Newport's current indebtedness to Commerce Bank as approximately $2,756,400, plus attorney's fees and costs. (Doc. 40: [cash collateral stipulation], Recitals, ¶ E.)

## A.     The state court litigation

6.     Since purchasing the property in June 2008, Newport has never made a made a payment of real estate taxes. (Mallak Decl., ¶ 4 and Ex. B.) While Newport admits failing to pay property taxes due in 2009 and 2010 (Doc. 6 [first cash collateral motion], ¶ 18), an online search of Washington County property records shows delinquent taxes from 2008. (Mallak Decl., Ex. B.) The amount owed for delinquent property taxes, including penalties and accrued interest, is currently $147,632.35. (Mallak Decl., ¶ 8.)

7.     In March 2010, Commerce Bank sued Newport and its owner, Hyder Jaweed, in state court to foreclose Commerce Bank's mortgage, to appoint a receiver, and to enforce Jaweed's personal guaranty. (Doc. 6 [first cash collateral motion], ¶ 19; Jensen Decl., ¶ 2.)

8.     Several months later, after unsuccessfully attempting to negotiate a resolution, Commerce Bank proceeded with its motion for the appointment of a receiver to manage the property. (Doc. 6 [first cash collateral motion], ¶ 19; Jensen Decl., ¶ 2.)

9.     Newport filed a cross-motion, asking the court to determine the amount needed to reinstate its mortgage under Minn. Stat. § 580.30. (Doc. 6 [first cash collateral motion], ¶ 19; *see also* Jensen Decl., ¶ 2 and Ex. A.)

3

10.     Newport opposed Commerce Bank's motion for the appointment of receiver, arguing in its brief that:

> Appointment of a receiver is unwarranted, particularly in light of **Newport's intention to reinstate the Newport Mortgage in accordance with Minn. Stat. 580.30**. Appointing a receiver will only cause unnecessary administrative costs that will consume limited resources – resources better spent effectuating Newport's reinstatement.

(Jensen Decl., Ex. A, p. 1., emphasis added.)

11.     On October 20, 2010, the state court granted both parties' motions, appointing a receiver who could be terminated if Newport fulfilled the terms and conditions of reinstatement.  (Jensen Decl., Ex. B.)  The court's order noted Newport's statement that it "stands ready" to pay its delinquent property taxes in order to redeem the property.  (Jensen Decl., Ex. B, p. 2.)

12.     Upon receiving the state court's order, Newport made no effort to reinstate its mortgage or even cure any of its payment defaults.  Instead, five days after the court's order, Newport filed its Chapter 11 bankruptcy petition.

**B.     Newport's assets and creditors**

**Real property and secured claims therein**

13.     Newport initially valued the property in its schedules at $3,700,000.  (Doc. This is apparently based upon a valuation that Newport claims to have obtained when it purchased the property in June 2008.  (Doc. 40 [supplemental declaration of Hyder Jaweed], Ex. A; see also Doc. 6 [first cash collateral motion], ¶ 28; Doc. 46 [second cash

collateral motion], ¶ 23.)  More recently, Newport has valued the property at "more than $3 million."  (*Id.*)

14.     Newport's bankruptcy Schedule D identifies three creditors holding a total of $2,843,433.50 in claims secured by the property:  Commerce Bank ($2,700,000), Washington County ($142,489.50), and Dan Larson Enterprises, Inc ($944).

15.     Newport admits that, as of the date of filing of the bankruptcy petition, the amount of Newport's debt to Commerce Bank is as follows:  principal of $2,699,230.94; regular interest of $4,884.41; default interest of $52,284.86; and costs of collection, including attorneys fees.  (Doc. 41 [cash collateral stipulation], Recitals, ¶ E.)  While Newport has made interest payments to Commerce Bank during bankruptcy, it has made no principal payments, and default interest on Newport's obligation continues to accrue at a rate of 3% per annum, or approximately $225 per day.  (Mallak Decl., ¶ 9.)

16.     Newport's indebtedness to Washington County is listed in Newport's schedules as $142,489.50; this amount has since grown to $147,632.35.  (Mallak Decl., ¶ 8 and Ex. B.)

**Personal Property**

17.     Newport's bankruptcy Schedule B identifies a 2006 Range Rover sport utility vehicle.  Mr. Jaweed asserts a secured claim in the Range Rover that exceeds its scheduled value of $22,075.

18.     Newport's Schedule B also identifies personal property valued at $17,474.70 consisting of rents and security deposits held by Commerce Bank.  These constitute "cash collateral" in which Commerce Bank has a secured interest.

1163173

19.     Finally, Newport's Schedule B identifies additional miscellaneous personal property valued at $5,837.

## Unsecured Creditors

20.     According to Newport's Schedule F, Newport had unsecured debt of $374,947.02; however, this amount includes $328,000 in insider debt allegedly owed to Mr. Jaweed.  Excluding the alleged debt to Mr. Jaweed, Newport has scheduled $46,947.02 as being owed to unsecured creditors.

## C.     Newport's Revenues and Expenses

21.     Newport's "primary source of revenue" is tenant rents. (Doc. 6 [first cash collateral motion], ¶ 14.) Newport has filed operating reports for the months of November and December 2010.  (Docs. 43 & 44.)

22.     Recently, Newport has filed cash flow projections along with its new motion for use of cash collateral. (Doc. 46 [second cash collateral motion], p. 11.) Newport's projected rent collections for February through April 2011 are $36,450 per month, significantly higher than the rents actually collected in November and December. (Compare Doc. 46 [second cash collateral motion], p. 11, with Doc. 44 [December 2010 monthly operating report], p. 2, and Doc. 43 [November 2010 monthly operating report], p. 2.)  According to the operating reports, Newport collected $32,721 in rents from the date that the case was filed, October 25, 2010, through November 30, 2010 (Doc. 43, p. 2) and $33,004 in rents for December 2010. (Doc. 44, p. 2.)

1163173

23. The December 9, 2010 Supplemental Declaration of Hyder Jaweed (Doc. 40), includes Newport's cash flow projections for December 2010 through February 2011. Excluding professional fees, these monthly projected expenses are:

| | |
|---|---|
| December 2010 | $25,849 |
| January 2011 | $25,849 |
| February 2011 | $28,049 |

24. The projections are noteworthy in at least the following respects:

- They do not set aside reserves for capital expenditures on long-term maintenance projects, such as painting, repair and replacement of roofs, windows, carpeting, appliances, equipment and mechanical systems.

- They budget nothing for lawn and landscaping even though Newport paid $1,546 to "D's Lawn & Landsc…" on December 24, 2010 (presumably for snow removal). (Doc. 44, p. 5.)

- They budget $5,500 per month for professional fees related to the bankruptcy, including legal and accounting fees. In December, Newport incurred over *six times* this amount in professional fees, exceeding its budget for professional fees by $31,093.02, incurring on top of its operational expenses, $36,093.02 in professional fees. (Doc. 44, p. 10; (Doc. 40, p. 10.)

- They do not budget anything for payment of principal on the loan from Commerce Bank.

- They do not budget anything for payment of past-due real estate taxes.

- They do not budget anything for payment of default interest on the loan from Commerce Bank or penalties and interest accruing on the unpaid real estate taxes.

- They do not budget anything for payment of bank fees.

**Newport's plan to liquidate**

25.     In preliminary motion papers, Newport stated that it intended to sell its

property "for an amount exceeding what it believes it owes Commerce Bank." (Doc. 6,

[first cash collateral motion, ¶ 21.)  Mr. Jaweed confirmed this plan during the December

13, 2010 creditors' meeting, testifying that he did not have any "backup plans" in case

the Newport property failed to sell.  (Jensen Decl., ¶ 6 and Ex. C.)

26.     In the same preliminary motion papers, filed on October 29, 2010, Newport

stated that it had "received an expression of interest from a potential buyer for more than

what is owed Commerce Bank."  (Doc. 6 [first cash collateral motion], pp. 4-5.)  Since

then, no buyer has materialized.

27.     Even though the purported purchase agreement signed by this mystery

buyer is contingent upon Commerce Bank agreeing to finance the transaction, Commerce

Bank has yet to be contacted by any buyer.  (Mallak Decl., ¶¶ 11, 13 and Ex. D.)  Despite

Commerce Bank's repeated requests, Commerce Bank has yet to receive from a

prospective buyer:  a loan application, business plan, projections, or statement of relevant

experience.  (*Id*; Jensen Decl., Ex. D.)

## ARGUMENT

**I.      The evidence of Newport's bad faith filing is overwhelming because virtually
all of the circumstantial "badges" of bad faith are present in this case.**

The Eighth Circuit, like other Circuits, recognizes bad faith as a "cause" for

dismissal under § 1112(b).  *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 -381 (8th

Cir. 2000).  "Good faith is a jurisdictional consideration." *Stage I Land Co. v. U.S.*

*Housing and Urban Development Dept.*, 71 B.R. 225, 229 (D.Minn. 1986). Newport

"bears the burden of proving that the filing was made in good faith." *See Id.* Whether a

petition should be dismissed for cause is a question of fact. *Id.* at 379. This court's

factual findings are reviewed for clear error and will only be reversed for abuse of

discretion. *Id.*

A finding of bad faith is usually based upon circumstantial evidence. *See In re*

*Roxy Real Estate Co., Inc.*, 170 B.R. 571, 573 (Bankr.E.D.Pa. 1993) ("[i]t is unlikely that

a debtor will ever acknowledge its own bad faith"). The Eight Circuit has set forth a list

of factors indicative of a bad faith filing:

- the debtor has only one asset encumbered by the liens of secured creditors or to which the debtor does not hold legal title;

- the case is essentially a two-party dispute capable of prompt adjudication in state court;

- there are only a few unsecured creditors;

- the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;

- the filing of the petition effectively allows the debtor to evade court orders;

- the debtor has no ongoing business to reorganize;

- the debtor has few employees;

- the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditor to enforce their rights.

*In re Hatcher,* 218 B.R. 441, 448 (8th BAP 1998); *In re Marion Street Partnership*, 108

B.R. 218, 223 (Bkrtcy.D.Minn. 1989) (citing *Phoenix Picadilly*, 849 F.2d 1393 (11th Cir.

1988); *In re State St. Houses, Inc.*, 356 F.3d 1345, 1347 (11th Cir. 2004). The circumstances of this case bear virtually all of the hallmarks of bad faith, incontrovertible and compelling evidence that Newport's purpose in filing was not to reorganize under Chapter 11, but to delay a foreclosure action pending in state court.

First, Newport has admitted that it is a single-asset real estate entity. Newport's only significant asset is the apartment complex. Newport's only other assets are personal property valued at $45,386.70, including: (1) a 2006 Range Rover sport utility vehicle valued at $22,075 in which Mr. Jaweed has a secured claim exceeding the Range Rover's scheduled value; (2) rents and security deposits of $17,474.70 that constitute "cash collateral" in which Commerce Bank has a secured interest; and (3) miscellaneous personal property valued at $5,837.

Second, this case is largely a two-party dispute between Newport and Commerce Bank. The ongoing litigation between Commerce Bank and Newport, combined with the fact that Newport faced no imminent threat from any of its other creditors "is compelling evidence that this Chapter 11 filing is a mere two-party dispute relating to real property," with Commerce Bank trying to exercise its foreclosure rights as the mortgagee and Newport seeking to delay foreclosure. *See In re State Street Houses, Inc.,* 305 B.R. 726, 736 (S.D. Fla. 2002). The fact that Newport filed just days after the appointment of a receiver is also evidence that its dispute with Commerce Bank was the "dominant factor that precipitated" Newport's filing. *See Id.* at 737. Moreover, Commerce Bank is by far the largest secured creditor ($2,756,400.20 as of the petition date), followed by

Washington County's secured claim for unpaid real estate taxes, which amounts to less than one-tenth that of Commerce Bank's secured claim.

Third, there are only a few unsecured creditors. According to Newport's bankruptcy schedules, there are $2,843,433.50 in secured claims, compared with $374,947.02 in non-priority unsecured claims. However, for purposes of this factor, Jaweed's $328,000 debt should not be considered. *See In re State Street Houses,* 305 B.R. at 735 (citing various cases for the proposition that courts applying this factor "typically disregard unsecured debts owed to insiders, and instead consider only the amounts owed to non-insider, unsecured creditors"). Thus, the $2,843,433.50 in secured claims must be compared with only $46,947 in unsecured claims.

Fourth, it cannot be disputed that a foreclosure action was pending when Newport filed its petition. In fact, Newport filed only five days after the state court's order appointing a receiver to manage the property.

Fifth, Newport's filing has to this point allowed Newport to evade the state court's order appointing a receiver to manage the property.

Sixth, Newport has readily admitted its intention to sell the property as soon as it can find a buyer. Newport has also admitted that it has no backup plan if a buyer cannot be located.

Seventh, Newport has no employees to protect as most of its operations are performed by either tenants, who receive some form of rent credit, or independent contractors. Also, as stated above, Newport has made it abundantly clear that it does not intend to rehabilitate the business, but instead to sell the property.

11

Eighth, the timing of the filing evidences Newport's intent to frustrate Commerce Bank's legitimate efforts to enforce its mortgage rights. "Single asset real estate Chapter 11 filings are routinely dismissed, where, as here, it is obvious that the proceeding was commenced solely to prevent mortgagees from foreclosing on the property at issue." *In re State Street Houses, Inc.*, 305 B.R. at 735. *See also Phoenix Piccadilly,* 849 F.2d at 1394-95 (finding bad faith where the petition was intended to forestall foreclosure on the debtor's apartment complex). The fact that Newport filed bankruptcy a few days after receiving the Court's order appointing a receiver and setting conditions for reinstatement *despite Newport's representation to the state court that it intended to cure its defaults and reinstate its mortgage* suggests that Newport was also trying to forestall the state court's appointment of a receiver. This is additional evidence of bad faith. *See Id.*

Newport's bad faith is evidenced by the fact that Newport has failed to produce a buyer despite its representations to both this court and Commerce Bank about such a buyer and the existence of a signed purchase agreement. Three months ago, Newport represented that it had "received an expression of interest from a potential buyer for more than what is owed to Commerce Bank." (Doc. 6 [first motion to use cash collateral], ¶ 21.) Even though Newport now claims to have a signed purchase agreement, this agreement is contingent on financing *by Commerce Bank.* (Mallak Decl., ¶ 11 and Ex. D.) In the meantime, Commerce Bank yet to receive documentation that you would expect to see from a legitimate buyer who hopes to obtain financing from the current lender, such as a loan application, cash flow projections, a business plan, a summary of the buyer's experience, etc. (Mallak Decl., ¶¶ 12-14 Jensen Decl., Ex. D.) In fact,

despite repeated requests by Commerce Bank, no buyer has stepped forward. (*Id.*) This strongly suggests that the purported sale identified by Newport is not a legitimate sale.

Moreover, the purported purchase agreement signed by the buyer appears to be taken from an old form of agreement that was not fully vetted. For example, the purchase agreement provides that "Seller and Buyer will pro-rate to the Closing on a per diem basis all Taxes payable in **2008** . . . ," and requires the buyer to pay all taxes for subsequent years. (Mallak Decl., Ex. D, ¶ 9.5, emphasis added.)

Based upon all of the foregoing, at this point, Commerce Bank would not agree to provide financing to the purported buyer. (Mallak Decl., ¶ 14.)

Finally, to the extent that Newport might make a belated attempt to prove its intent to reorganize, such efforts are wholly irrelevant because "bad faith alone is sufficient to warrant dismissal, regardless of the possibility of reorganization." *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 -381 (8th Cir. 2000) *See also Phoenix Piccadilly*, 849 F.2d at 1395 ("the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal").

## II.     Dismissal for cause under 1112 (b)(4)(A)

In addition to Newport's bad faith, § 1112(b)(4)(A) provides independent grounds for dismissal. Under that section, "cause" for conversion or dismissal includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." This two-prong test is easily satisfied here.

## A. Substantial or continuing loss or diminution to the estate

Newport's negative cash flow situation "alone is sufficient to establish 'continuing loss to or diminution of the estate.'" *Loop v. U.S. Trustee*, 379 F.3d 511, 515-16 (8th Cir. 2004). The Eighth Circuit articulated the reason for this:

> The purpose of § 1112(b)(1) is to preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation. In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow-including that resulting only from administrative expenses-effectively comes straight from the pockets of creditors.

*Id.* at 516.

In this case, Newport's projections for February through April 2011 are:

## Cash Flow Projections for February 2011 through April 2011

| Revenue | February | March | April |
|---|---|---|---|
| Rent | 36,450 | 36,450 | 36,450 |
| **Total Revenue** | **36,450** | **36,450** | **36,450** |
| | | | |
| **Operating Expenses** | | | |
| Bank Fees | - | - | - |
| Electric and Gas | 3,030 | 2,425 | 2,425 |
| Caretaker Rent Credit | 635 | 635 | 635 |
| Insurance | 2,200 | - | - |
| Interest Payment | 14,650 | 14,650 | 14,650 |
| Maintenance Rent Credit | 810 | 810 | 810 |
| Office Rent Credit | 810 | 810 | 810 |
| Professional Fee – Bankruptcy | 5,500 | 5,500 | 5,500 |
| Professional Fee – Trustee | - | - | 975 |
| Property Tax | 4,764 | 4,764 | 4,764 |
| Refuse | 1,200 | 1,200 | 1,200 |
| Supplies | 1,500 | 1,500 | 1,500 |
| Telephone | 150 | 150 | 150 |
| Water & Sewer | 1,000 | 1,000 | 1,000 |
| **Total Operating Expense** | 36,249 | 33,444 | 34,419 |
| | | | |
| **Net Cash Flow** | **201** | **3,006** | **2,031** |

1163173

(Doc. 46 [second cash collateral motion], p. 11.)  As set forth below, even this meager cash flow projected by Newport is unrealistic.

### 1. Newport's Revenues

Newport's first two monthly operating reports indicate that, since the petition date, Newport has generated revenues as follows:

| 10/25/2010 to 11/30/2010 | 12/1/2010 to 12/31/2010 |
|---|---|
| $32,721.00 | $33,004.00 |

(Doc. 43[November monthly operating report], p. 2; Doc. 44[December monthly operating report], p. 2.)

Newport contends that the apartment complex is 95% leased.  (Doc. 46 [second cash collateral motion], ¶ 23; Doc. 40 [Jaweed supplemental declaration], p. 6, stating that the Newport property had three vacancies as of December 7, 2010, and two tenants who were behind on their rent.)  Despite these operating results, Newport has recently filed projections with the court predicting revenues for February through April 2011 as follows:

| 2/1/2011 to 2/28/2011 | 3/1/2011 to 3/31/2011 | 4/1/2011 to 4/30/2011 |
|---|---|---|
| $36,450 | $36,450 | $36,450 |

(Doc. 46 [second cash collateral motion], p. 11.)[1]  Thus, Newport inexplicably predicts

that the monthly revenue will increase by at least $3,500 per month despite the fact that

the apartment complex already has a low vacancy rate.  There is no legitimate reason to

believe that Newport's revenues will increase to these levels.[2]

### 2.    Newport's Expenses

Newport's expense projections are deficient for a number of reasons.  First,

Newport projects that professional fees will be $5,500 per month during February

through April 2011.  However, Newport's December 2010 monthly operating report

reveals professional fees for the first two months of the bankruptcy to be $36,093.02.

Newport's projection of professional fees of only $5,500 (for both legal and accounting

fees) is unreasonable.  These ongoing expenses in connection with administering the

estate amount to a "continuing loss to or diminution of the estate." *See In re Loop Corp.*,

379 F.3d 511, 515 (8th Cir. 2004).

Second, Newport's cash flow projections and operating reports fail to include any

reserves for capital expenditures, such as repair and replacement of roofs, carpets,

windows, appliances, mechanical systems, etc.  The property consists of three apartment

buildings built in 1971.  Periodic capital expenditures will be necessary in order to

maintain the property's value.

---

[1] In its previous cash collateral motion, Newport was not quite as overreaching.  It projected revenue of $34,430 per month.  (Doc. 40 [first cash collateral motion], p. 10.)  Prior to the time that Newport filed bankruptcy, Commerce Bank collected rents for several months.  Those collections averaged less than $30,000 per month.  (Mallak Decl., Ex. C.)

[2] To the extent that Newport is attempting to prop-up its revenues by assuming 100% occupancy and payment, that assumption is unreasonable for any sustained period of time.

Moreover, the only line item related to any maintenance is a rent credit for a tenant to perform minor maintenance on the property. There is no line item for maintenance costs that the tenant would not ordinarily perform, such as painting units and maintenance items that would require a licensed electrician, plumber, etc. Newport's failure to budget for inevitable capital expenditures and maintenance costs is further evidence of a continuing loss or diminution of the estate. *See, e.g., Prince Manor Apartments, Ltd.,* 104 B.R. 414, 417 (N.D. Fla. 1989) *(*granting dismissal, and stating in part that the debtor's plan failed "to provide for the inevitable maintenance costs" of the apartment complex).

Third, Newport has budgeted nothing for snow removal during the three months covered by the projections. It is unreasonable to assume that Newport will not incur snow removal charges during the February through April period. Thereafter, lawn care and landscaping costs will be incurred.

Fourth, Newport has budgeted nothing for bank charges. Although it is a relatively small item, it will be a monthly expense that Newport has overlooked.

Finally, the accrual of interest and penalties on unpaid taxes and the accrual of default interest on Commerce Bank's loan both continue to erode the equity in the property. *See In re Thurman*, 163 B.R. 95 (W.D. Texas 1994) (stating that failure to pay delinquent taxes "could unduly diminish the bankruptcy estate by the amount of penalty and interest which accrues" resulting in cause for conversion or dismissal). Currently, delinquent property taxes on the property's four parcels total $147, 632.35, which is $5,142.85 more than the amount scheduled as of October 25, 2010. Moreover, default

17

interest continues to accrue on Commerce Bank's loan at a rate of approximately $6,750 per month.

Newport's meager revenues, which show no sign of increasing, are heavily outweighed by Newport's operating expenses, the expenses of bankruptcy administration, the continuing accrual of interest and penalties on delinquent real estate taxes and the loan from Commerce Bank, and the Newport's failure to reserve for inevitable capital expenditures. The first prong of the test is satisfied because Newport's expenses are eroding the position of Newport's secured creditors and are diminishing the value of Newport's only substantial asset.

**B.     No reasonable likelihood of rehabilitation**

Newport's stated intention to sell the property rather than restore its business operations establishes the "absence of a reasonable likelihood of rehabilitation." *In re Loop*, at 516. A debtor's intention to liquidate its property precludes a finding that there is a reasonable likelihood of rehabilitation under §1112(b)(4)(A)). *Id.*; *see also In re Ledges Apartments,* 58 B.R. 84, 87 (Bankr.D.Vt. 1986) ("Reorganization encompasses rehabilitation and may contemplate liquidation. Rehabilitation, on the other hand, may not include liquidation.")

Here, Newport's intention to sell its only significant asset, combined with its poor cash flow situation discussed above, establish that there is no reasonable likelihood of rehabilitation. Over three months ago, Newport stated its intention to sell the property and stated that it had "received an expression of interest from a potential buyer . . . ." (Doc. 6 [first cash collateral motion], ¶ 21.) Mr. Jaweed, confirmed this plan during the

December 13, 2010, creditors meeting, testifying that he did not have any "backup plans" in case the property failed to sell. (Jensen Decl., ¶ 6 and Ex. D.) Moreover, for all of the reasons discussed in the preceding sections of this memorandum, Commerce Bank would not agree to finance the sale to this purported buyer, and Commerce Bank would not support a plan of reorganization providing for continued operation of the business if one were to be proposed by Newport. (Mallak Decl., ¶ 16.)

In short, the second prong of the test is satisfied because there is a complete absence of a reasonable likelihood of rehabilitation.

**III.    This case should be dismissed rather than converted.**

Section 1112(b)(1) states that the Court "shall convert a case under this chapter to a case under Chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause."  11 U.S.C. § 1112(b)(1).

In this case, dismissal is in the best interest of the creditors.  Dismissal would permit Newport's largest creditor to proceed with its foreclosure action in state court. Moreover, Newport is currently hemorrhaging money, which threatens to compromise the value of Commerce Bank's collateral.  On the other hand, a Chapter 7 bankruptcy trustee would serve little purpose because there is no reason to believe that a trustee could reach additional assets to benefit the estate's creditors.  These factors, combined with the fact that Newport has no additional capital to do anything more than make interest payments to Commerce Bank supports dismissal as the most appropriate relief in this case and in the best interest of the estate's creditors.

## CONCLUSION

Based on the undisputed evidence, there is ample support for a finding that cause exists to grant Commerce Bank's motion to dismiss under 11 U.S.C. § 1112(b)(4)(A) and on the grounds of bad faith.

Dismissal is appropriate because Newport lacks the support of its largest secured creditor and has insufficient income to sustain operations and administer this bankruptcy. There would be no purpose served in converting the case. Accordingly, Commerce Bank requests an order dismissing Newport's Chapter 11 case.

DATED: February 9, 2011          **FABYANSKE, WESTRA, HART & THOMSON, P.A.**

By: s/ Richard G. Jensen
     Richard G. Jensen (#18990X)
     Theodore V. Roberts (#031318X)
     800 LaSalle Ave., Suite 1900
     Minneapolis, MN 55402
     Telephone: (612) 359-7600
     Fax: (612) 359-7602
     **ATTORNEYS FOR MOVANT**

1163173

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

_____

In re:                                                    Case No. 10-47910

Newport Investments, LLC,                                      Chapter 11 Case

       Debtor.

_____

## DECLARATION OF RICHARD G. JENSEN

_____


       Richard G. Jensen, being first duly sworn on oath, states:

       1.      I am an attorney with the law firm of Fabyanske, Westra, Hart & Thomson, P.A.  I am one of the attorneys representing Commerce Bank in this case.  I have personal knowledge of the facts stated in this declaration.

       2.      Commerce Bank commenced a lawsuit in Washington County district court in March of 2010, to foreclose its mortgage against the real property owned by the debtor, Newport Investments, LLC, to appoint a receiver, and to enforce the personal guaranty of Newport's owner, Hyder Jaweed.  After attempting unsuccessfully for several months to negotiate a resolution, Commerce Bank proceeded with its motion for appointment of a receiver.  A copy of Newport's opposition to Commerce Bank's motion is attached hereto as **Exhibit A**.

       3.      Newport countered with its own cross-motion, asking the state court to determine the amount needed to reinstate its mortgage under Minn. Stat. § 580.30.

4.      A copy of the Washington County district court's order granting Commerce Bank's motion is attached hereto as **Exhibit B**.  The district court ruled that Newport is liable for default interest calculated from February 10, 2010.

5.      On December 13, 2010, I attended the creditors meeting in this case.

6.      At the creditors meeting, Newport's representative acknowledged that Newport's intent in this case is to sell its property.  The representative acknowledged that Newport has no backup plan.  My office transcribed the recording from the meeting.  An excerpt of the relevant portion is attached hereto as **Exhibit C**.

7.      On January 21, 2011, I received from Newport's legal counsel a purchase agreement for the property, which I forwarded to Commerce Bank.  Attached hereto as **Exhibit D** are e-mail exchanges between Newport's legal counsel and me related to the purchase agreement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2011           /s/ Richard G. Jensen
                                       Richard G. Jensen

STATE OF MINNESOTA

COUNTY OF WASHINGTON

**DISTRICT COURT**

**TENTH JUDICIAL DISTRICT**

**CASE TYPE:  FORECLOSURE,
BREACH OF CONTRACT**

Commerce Bank,

        Plaintiff,

v.

Newport Investments, LLC, Forest Lake
Apartments Housing Associates, LLC, Hyder
R. Jaweed, Dan Larson Enterprises, Inc., d/b/a
Zahl-Petroleum Maintenance Company, and
Rental Research Services, Inc., Bank Mutual,
Gerald J. Strantz, and Roland S. Strantz,

        Defendants.

Court File No.  82-CV-10-1348

**DEFENDANTS' NEWPORT
INVESTMENTS, LLC, FOREST LAKE
APARTMENTS HOUSING ASSOCIATES,
LLC, AND HYDER JAWEED'S
MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR
APPOINTMENT OF A RECEIVER**

## INTRODUCTION

Defendants Newport Investments, LLC ("Newport"), Forest Lake Apartments Housing

Associates, LLC ("Forest Lake Housing"), and Hyder Jaweed submit this memorandum in

opposition to Plaintiff Commerce Bank's ("the Bank") motion for appointment of a receiver.

Appointment of a receiver is unwarranted, particularly in light of Newport's intention to reinstate

the Newport Mortgage in accordance with Minn. Stat. § 580.30.  Appointing a receiver will only

cause unnecessary administrative costs that will consume limited resources – resources better

spent effectuating Newport's reinstatement.

## FACTS

As indicated in Newport's Memorandum in Support of Defendant's Motion for

Determination of Reinstatement Amount ("Newport's Reinstatement Memorandum"), the



background facts are largely undisputed. Rather than repeat those facts here, Defendants incorporate and further supplement them below.

The issue in this lawsuit is whether Newport or Forest Lake Housing have defaulted on their respective agreements and mortgages with the Bank. If they have defaulted, then the second issue is determining the cost of curing such default(s). In both its July 12, 2010 letter and its Supplemental Memorandum in Support of its Motion to Appoint a Receiver, the Bank identified eight categories of alleged defaults. (*See* Newport's Reinstatement Mem. at 6-10; Pltf.'s Supplemental Mem. in Supp. of Mot. to Appoint Receiver ("Pltf. Supplemental Mem.") at 2-4.) These eight categories encompass the only alleged defaults identified in any pleading submitted by the Bank. (*See, e.g.*, Pltf. Mem. Supp. Motion to Appoint Receiver at 4; Compl. ¶ 38.) Of the eight categories of alleged defaults, seven are in dispute. (*See* Newport's Reinstatement Mem. at 6-10.)

Newport has moved the Court to determine the amount due to the Bank pursuant to Minnesota's reinstatement statute, Minn. Stat. § 580.30, so that Newport may reinstate the Newport Mortgage. Once Newport reinstates, the Bank must cease its foreclosure action and there will be no basis for the appointment of a receiver. *See* Minn. Stat. § 580.30, subd. 1. In light of these facts, imposition of a receiver is unwarranted. Appointing a receiver will only result in a needless waste of resources – resources better spent effectuating Newport's reinstatement. Therefore, in the interests of justice and conservation of both judicial and the parties' resources, the Bank's motion should be denied.

**ARGUMENT**

**I.     THE BANK HAS NOT ESTABLISHED THAT A RECEIVER IS WARRANTED.**

**A.     The Bank Has Not Established An Equitable Basis For Appointment Of A Receiver.**

Minnesota Statute § 576.01, subd. 1(1) provides that a receiver <u>may</u> be appointed when:

> before judgment, on the application of any party to the action who shall show an apparent right to property which is the subject of such action and is in the possession of an adverse party, and the property, or its rents and profits, are in danger of loss or material impairment, except in cases wherein judgment upon failure to answer may be had without application to the district court[.]

To be entitled to a receiver under this subdivision, the Bank must demonstrate circumstances requiring equitable relief. *Mut. Ben. Life Ins. Co. v. Frantz Klodt & Son, Inc.*, 237 N.W.2d 350, 353 (Minn. 1975) (affirming district court's denial of motion for appointment of receiver pending foreclosure). The Bank must also demonstrate an "imminent danger of loss and that there is no adequate remedy at law." *Id.* "Usually such a showing will require proof that (1) the mortgagor is insolvent; (2) the mortgagor was committing waste; and (3) the value of the security is inadequate to cover the mortgage debt." *Id.*; *see also Straus v. Straus*, 94 N.W.2d 679, 84 (Minn. 1959). Absent such a showing, the Court should not appoint a receiver. *Mut. Ben. Life Ins. Co.*, 237 N.W.2d at 353.

Receiverships should not be granted in doubtful cases. *Straus*, 94 N.W.2d at 683-84. Rather, there "must be clear, strong and convincing" evidence to support a motion for appointment of a receiver. *Id.* Indeed, motions for appointment of a receiver should "be granted or denied in the exercise of a court's discretion and not on the ground that the applicant is entitled to it as a matter of law." *Mut. Ben. Life Ins. Co.*, 237 N.W.2d at 352.

The Bank has not established that it is in imminent danger of loss or that it lacks an adequate remedy at law. The Bank has not provided any evidence indicating that Defendants are

3

insolvent or that its security is insufficient to cover the mortgage debt. While the Bank broadly alleges that Defendants have committed waste, the Bank has provided little admissible evidence to support that claim.[1]

The Bank's one specific allegation of waste is the existence of unpaid water/sewer bills. Defendants acknowledge that there are $6,212.68 in outstanding water/sewer expenses at the Newport Property. (*See* Newport Reinstatement Mem. at 7-8.) At the same time, Newport has made significant payments toward satisfaction of water/sewer expenses since January 2010, despite the fact that the Bank has been collecting all rents from Newport's tenants since that time. (*See id.*) More importantly, the Bank has not shown that these water/sewer expenses, which Newport will pay in full when it reinstates the Newport Mortgage, have caused waste. Apart from the lack of a showing of waste, the Bank has made no allegation that the Bank is in imminent danger of loss or that the Bank lacks an adequate remedy at law. In short, the Bank fails to establish a basis for appointment of a receiver under Minn. Stat. § 576.01, subd. 1.

### B. Newport Has Indicated It Is Willing To Pay Property Taxes As A Part Of Reinstating, Negating The Need For A Receiver.

The Bank also cites Minn. Stat. § 576.01, subd. 2 as a basis for appointment of a receiver. (Pltf. Mem. Supp. Motion to Appoint Receiver at 7.) Under that subdivision, a mortgagee may move for appointment of a receiver if a mortgagor has breached a covenant in a mortgage

---

[1] The Bank claims that it has received complaints from tenants of the Newport Property regarding conditions at the Newport Property. (Pltf. Supplemental Mem. at 3.) The Bank does not provide a single piece of evidence to support that allegation. Even if the Bank did receive complaints from tenants, the Bank has not demonstrated that the complaints were accurate, the result of Newport's actions or omissions, or indicate waste at the Newport Property. Moreover, the alleged complaints occurred while the Bank was collecting all rents from Newport's tenants. If Newport's tenants experienced problems, it was because the Bank failed to properly apply the rents it collected toward upkeep of the Newport Property. The Bank cannot use its own failure to support imposing a receiver on Newport.

relating to payment of property taxes.[2]  The Defendants admit that there are certain outstanding

property taxes due on the mortgaged properties.  (*See* Answer ¶ 38.)

Even if the Bank is entitled to a receiver under this subdivision, courts have discretion in

receivership proceedings to do what is best for all concerned.  *Minn. Hotel Co., Inc. v. ROSA*

*Dev. Co.*, 495 N.W.2d 888, 893 (Minn. Ct. App. 1993).  At a minimum, the Court should refrain

from entering an order appointing a receiver until Newport has an opportunity to reinstate the

Newport Mortgage.  Once that is accomplished, there will be no basis, yet alone a need, for the

appointment of a receiver.  Delaying the imposition of a receiver will certainly save the parties

(and the Court) from substantial and unnecessary receivership expenses.  Furthermore, a

reasonable delay will provide the Bank with additional incentive to provide accurate information

about the reinstatement amount.  On the other hand, such a delay will not cause the Bank any

prejudice or damage whatsoever.

## C.    The Bank Has Not Established Any Other Basis For The Appointment Of A Receiver.

Finally, the Bank claims the Court may appoint a receiver under the parties' agreements.[3]

(Pltf. Mem. Supp. Motion to Appoint Receiver at 8.)  Minnesota Statute § 576.01 is not

---

[2] Minnesota Statute § 576.01, subd. 2 also permits a mortgagor to move for the appointment of a receiver if the mortgagor has breached a covenant in the mortgage relating to tenant security deposits.  Although the Bank has alleged that Newport failed to properly apply tenant security deposits in accordance with the Newport Mortgage, the Bank's allegation is based upon its demand that Newport go beyond the terms of Minn. Stat. § 504B.178 and establish a separate escrow account for security deposits.  (*Compare* Pltf. Supplemental Mem. at 2 *with* Newport's Reinstatement Mem. at 8.)  The Bank's demand is beyond both the terms of the Newport Mortgage and Minn. Stat. § 504B.178.  Therefore, this is not a proper basis for appointing a receiver.

[3] The Bank also cited Minn. Stat. § 559.17, subd. 2 as a basis for the appointment of a receiver. (*See* Pltf. Mem. Supp. Motion to Appoint Receiver at 5-6.)  Minnesota Statute § 559.17 addresses the validity of an assignment of rents; it does not provide an independent basis for the appointment of a receiver.  *See also Mutual Ben. Life Ins. Co.*, 237 N.W.2d at 353 (Minn. Stat.

exclusive, and a court may also appoint a receiver under its general equitable powers consistent

with existing practice. *Asleson v. Allison*, 247 N.W. 579, 580 (Minn. 1933); *Minn. Hotel Co.,*

*Inc.*, 495 N.W.2d at 892 (statutory requirements need not be met where parties contractually

agree otherwise).

Contrary to the Bank's assertion otherwise, the parties' agreements do <u>not</u> contain any

provision entitling the Bank to a receiver. (Pltf. Mem. Supp. Motion to Appoint Receiver at 8

(citing *Minn. Hotel Co., Inc.*, 495 N.W.2d at 892).) *Minnesota Hotel Co., Inc.* does not support

the Bank's argument because in that case the parties had a specific agreement providing for

appointment of a receiver in the event of default. *See id.* at 890. There is no such provision in

any of the mortgages or agreements in this case.

## II.     THE COURT SHOULD FOCUS ON REACHING A JUST RESULT.

### A.      <u>Justice Does Not Support Appointing A Receiver.</u>

Appointment of a receiver is an equitable remedy. *See Asleson*, 247 N.W. at 580. The

purpose of a receiver is to accomplish, as far as practicable, complete justice for the parties

before the court. *Id.* at 500. A court's power to appoint a receiver must "be exercised with

reference to the facts of the case and in the furtherance of justice." *Bliss v. Griswold*, 25 N.W.2d

302, 307 (Minn. 1946). "Receiverships are notoriously expensive and rightly considered a last

resort. Frequently they have been hurtful rather than helpful to all concerned, save only the

receivers and their counsel." *Zwick v. Security State Bank of Red Wing*, 243 N.W. 140, 141

(Minn. 1932); *see also Asleson*, 247 N.W.2d at 580 ("The appointment of a receiver is a very

drastic proceeding, usually very expensive and frequently absorbing the greater part of the estate.

It is harsh, severe, drastic, heroic and costly.") (internal quotes and citations omitted).

---

§ 559.17 does not expand mortgagor's remedies; statute only addresses assignment of rents).
Therefore, the Bank's reliance on Minn. Stat. § 559.17 is misplaced.

Appointing a receiver will not further the interests of justice. A receiver will certainly impose steep administrative costs that will deplete what rents are collected. Rather than allow a receiver to siphon off a portion of these rents, all of the rents should be dedicated to curing any defaults that may exist. Similarly, scarce judicial resources will be consumed monitoring and directing the receivership. The parties will also incur significant attorney's fees in the process. Those resources should be spent on resolving this lawsuit. That is accomplished by determining the amount necessary to permit Newport to reinstate the Newport Mortgage.

In addition, because Newport intends to reinstate the Newport Mortgage, the receiver will not give the Bank any greater security than it will already receive if the motion is denied. The receiver will undoubtedly take longer to collect the funds necessary to cure any default than the time necessary for Newport to reinstate the Newport Mortgage. If the Bank is truly concerned about its security, it would certainly prefer that Newport immediately reinstate the Newport Mortgage. This will ensure that any existing defaults are cured within a matter of days, not months (as will be required for the receiver to accomplish the same task).

The only person or entity that will end up better off by the appointment of a receiver is the receiver itself, which stands to collect significant management fees for its work. *See also Zwick*, 243 N.W. at 141. All other parties will surely lose. The interests of justice certainly do not favor the Bank's motion.

## CONCLUSION

The Bank's motion for appointment of a receiver should be denied. Appointment of a receiver does not serve the interests of justice and will only impose unnecessary administrative burdens on the parties and the Court. Instead, the Court should direct the Bank to provide

7

accurate information necessary to determine the amount Newport must pay to reinstate the

Newport Mortgage.


Dated: July 28, 2010

ANTHONY OSTLUND BAER
& LOUWAGIE P.A.


By: _____
    Norman J. Baer (#163715)
    Cory D. Olson (#386941)
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: 612-349-6969
Facsimile: 612-394-6996

ATTORNEYS FOR DEFENDANTS
NEWPORT INVESTMENTS, LLC;
FOREST LAKE APARTMENTS, LLC;
AND HYDER R. JAWEED

# AFFIDAVIT OF SERVICE BY MAIL

Court File No. 82-CV-10-1348

STATE OF MINNESOTA )
                     ) ss.
COUNTY OF HENNEPIN )

      Julie M. Blakeley, being first duly sworn, deposes and says that on the 28th day of July,

2010, she served **Defendants' Newport Investments, LLC, Forest Lake Apartments Housing**

**Associates, LLC, and Hyder Jaweed's Memorandum in Opposition to Plaintiff's Motion for**

**Appointment of a Receiver** upon the parties and/or counsel listed below, by placing true and

correct copies thereof in an envelope addressed as follows:

| | |
|---|---|
| Commerce Bank | Kyle E. Hart, Esq.<br>Richard G. Jensen, Esq.<br>Fabyanske Westra Hart & Thomson<br>LaSalle Plaza, Suite 1900<br>800 LaSalle Ave<br>Minneapolis, MN 55402 |
| Dan Larson Enterprises, Inc. d/b/a Zahl-Petroleum Maintenance Company | Dan Larson Enterprises, Inc. d/b/a Zahl-Petroleum Maintenance Company<br>3101 Spring St. NE<br>Minneapolis, MN 55413 |
| Rental Research Services, Inc. | Rental Research Services, Inc.<br>7525 Mitchell Road, Suite 301<br>Eden Prairie, MN 55413 |
| Bank Mutual | Nell Mathews, Esq.<br>Lindquist & Vennum, PLLP<br>4200 IDS Center<br>80 South Eighth Street<br>Minneapolis, MN 55402 |
| Gerald J. Strantz | Gerald J. Strantz<br>658 12th Street SW, Apt. 102<br>Forest Lake, MN 55025 |
| Roland S. Strantz | Roland S. Strantz<br>16325 Cornell St. NE<br>Forest Lake, MN 55025 |

(which is the last known address of said Party or attorney) and depositing the same, with postage

prepaid, in the United States mail at Minneapolis, Minnesota.



Subscribed and sworn to before me
this 28th day of July, 2010.

Notary Public

MARY M. ROSSI
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2015

State of Minnesota
Washington County

District Court
Tenth Judicial District

Court File Number: **82-CV-10-1348**
Case Type: Civil Other/Misc.

**Notice of Filing of Order**

RICHARD G JENSEN
800 LASALLE AVE
SUITE 1900
MINNEAPOLIS MN  55402

---

**COMMERCE BANK vs  Newport Investments LLC,  Forest Lake Apartments Housing Associates LLC, Hyder R Jaweed, GERALD J STRANTZ, ROLAND S STRANTZ et. al.**

You are notified that an order was filed on October 20, 2010.

Order-Other

Dated: October 21, 2010

Annette Fritz, Court Administrator
By: Kristin Thompson, Deputy
Washington County District Court
14949 - 62nd St. N; PO Box 3802
Stillwater MN  55082
651-430-6263

cc:   CORY DAVID OLSON
      GERALD J STRANTZ
      ROLAND S STRANTZ
      Dan Larson Enterprises Inc
      Rental Research Services Inc
      NELL ELIZABETH MATHEWS

A true and correct copy of this notice has been served by mail upon the parties herein at the last known address of each, pursuant to Minnesota Rules of Civil Procedure, Rule 77.04.



EXHIBIT
B

STATE OF MINNESOTA                                          DISTRICT COURT

COUNTY OF WASHINGTON                                TENTH JUDICIAL DISTRICT
                                                    CASE TYPE: Mortgage Foreclosure,
                                                                Breach of Contract

Commerce Bank,

                    Plaintiff,                      Court File No. 82-CV-10-1348

                                                    Judge: Gary R. Schurrer
vs.

Newport Investments, LLC, Forest Lake
Apartments Housing Associates, LLC Hyder           **ORDER**
R. Jaweed, Dan Larson Enterprises, Inc., d/b/a
Zahl-Petroleum Maintenance Company, and
Rental Research Services, Inc., Bank Mutual,
Gerald J. Strantz and Roland S. Strantz,

                    Defendants.



---

This matter came before the Court upon concurrent motions of plaintiff Commerce Bank

("Commerce") and defendants Newport Investments, LLC ("Newport"), Forest Lake Apartments

Housing Associates, LLC ("Forest Lake"), and Hyder R. Jaweed ("Jaweed"). Commerce Bank

moved for the appointment of a receiver on two properties owned by Newport and Forest Lake

(the "Newport Property" and "Forest Lake Property," respectively). Defendants moved for the

determination of an amount to reinstate the mortgage between Newport and Commerce under

Minn. Stat. § 580.30. At the hearing, Bank Mutual joined in Commerce's motion for

appointment of a receiver over the Forest Lake Property.

        IT IS HEREBY ORDERED THAT:

        1.      **Appointment of Receiver.** In accordance with Minnesota Statutes §§ 559.17

and 576.01, subdivisions 1 and 2, and other applicable law, Beard Group Management, LLC

(the "Receiver"), is hereby appointed receiver of the properties located at 1660, 1624 and 1650

10th Avenue, Newport, Minnesota (the "Newport Property"), and 1243 11th Avenue Southwest, Forest Lake, Minnesota (the "Forest Lake Property"), and legally described in Plaintiff's complaint in this lawsuit.[1]

2. **Bond.** The Receiver is not required to post a bond.

3. **Powers and Duties of the Receiver.** Effective immediately, the Receiver shall take control of the Properties and shall separately manage each of the Properties. The Receiver shall have all of the powers and authority usually held by receivers and reasonably necessary to accomplish the purposes stated in this order. Without limiting any other power granted by this order or applicable law:

    a. The Receiver is directed to take any and all actions necessary or appropriate to prevent waste of, and to preserve and protect, the Properties, including, but not limited to:

        i. Maintaining insurance on the Properties;

        ii. Arranging and paying for utility services for the Properties;

        iii. Changing locks and security and access codes as the Receiver may deem necessary or appropriate;

        iv. Maintaining fire and security alarms at the Properties;

        v. Keeping real-estate taxes and assessments paid current on the Properties;

        vi. Providing caretaking and security staff as the Receiver may deem necessary or appropriate; and

        vii. Continuing, entering, or terminating contractual relations under maintenance, service and other contracts.

---

[1] The Newport Property and the Forest Lake Property will at times be referred to herein collectively as the "Properties."

b.    The Receiver is authorized, in its discretion, to lease the Properties or any space in the Properties for any term that the Receiver deems appropriate.

c.    The Receiver is directed to enforce the terms of any lease that is in effect during the duration of the receivership and may commence eviction actions against tenants, if the Receiver deems it necessary or appropriate to do so.

d.    The Receiver shall collect all rents, issues, profits, and other revenues derived from the Properties (collectively the "Revenues"). The Receiver shall not comingle the Revenues derived from the Newport Property and the Revenues derived from the Forest Lake Property. The Receiver shall distribute any funds it collects from each Property to the following items related to the management and operation of that Property in the following order of priority:

**Newport Property**

i.    First, to the Receiver for payment of receivership fees and any expenses incurred by the Receiver in connection with its management of the Property;

ii.    Second, to the repayment, when due, of any tenant security deposits pursuant to the provisions of Minnesota Statutes Section 504B.178;

iii.    Third, to the payment, when due, of all delinquent or current real estate taxes and special assessments payable with respect to the Property, or the periodic escrow for the payment of such taxes or special assessments;

iv.    Fourth, to payment, when due, of all premiums for insurance required by the provisions of Plaintiff's mortgage on the Property attached to its complaint (the "Mortgage"), or the periodic escrow for the payment of such premiums;

     v.      Fifth, to Plaintiff to be applied by Plaintiff in accordance with the terms and conditions of Mortgage, including application to the indebtedness secured by the Mortgage.

## Forest Lake Property

     i.      First, to the Receiver for payment of receivership fees and any expenses incurred by the Receiver in connection with its management of the Property;

     ii.     Second, to the repayment, when due, of any tenant security deposits pursuant to the provisions of Minnesota Statutes Section 504B.178;

     iii.    Third, to the payment, when due, of all delinquent or current real estate taxes and special assessments payable with respect to the Property, or the periodic escrow for the payment of such taxes or special assessments;

     iv.    Fourth, to payment, when due, of all premiums for insurance required by the provisions of Plaintiff's mortgage on the Property attached to its complaint (the "Mortgage"), or the periodic escrow for the payment of such premiums;

     v.      Fifth, to Bank Mutual to be applied by Bank Mutual in accordance with the terms and conditions of the first mortgage between Bank Mutual and Forest Lake, including application to the indebtedness secured by the first mortgage.

     vi.    Sixth, to Commerce Bank to be applied by Commerce Bank in accordance with the terms and conditions of the mortgage between Commerce Bank and Forest Lake, including application to the indebtedness secured by that mortgage.

e.     The Receiver is authorized, but not required, to exclude defendants Newport Investments, LLC, Forest Lake Apartments Housing Associates, LLC, and Hyder R. Jaweed (collectively the "Borrowers") and the Borrowers' agents, representatives, successors, and assigns from the Properties.

f.     The Receiver is authorized to enter into any agreements that the Receiver deems necessary or appropriate to prevent waste of, and to preserve and

protect, the Properties, including, but not limited to any supply, distribution, snow removal, landscaping, lawn care, maintenance, security, operations, repair and other contracts.

g.   The Receiver is authorized, but not required, to pay obligations previously incurred by the Borrowers with respect to the Properties if the Receiver deems it necessary or appropriate to do so in order to prevent waste of, and to preserve and protect, the Properties.

h.   The Receiver is authorized, but not required, to endorse any check received by the Receiver in the course of its management of the Properties and to execute in the name of the Borrowers any and all reports and other documents required to be executed in connection with the performance of the Receiver's obligations hereunder.

4.   **Advances to the Receiver.** Plaintiff is authorized, but not required, to advance funds to the Receiver to pay the expenses of the receivership. To the extent Plaintiff, in its sole discretion, advances such funds, the funds shall (i) be secured in the same priority with the indebtedness secured by the Mortgages, (ii) bear interest from the date of such advances at the same rate as provided in the promissory note executed by Defendant Newport Investments, LLC, in favor of Plaintiff and attached to Plaintiff's complaint (the "Note"), and (iii) immediately become part of the amount due pursuant to the Note. If such advances are made after any foreclosure sale of any of the Properties, such advances shall, with interest thereon, be part of the sum required to be paid to redeem from such sale. If such advances are made before any foreclosure sale of any of the Properties, such advances shall, with interest thereon, be part of the sum required to be paid to reinstate the Mortgages.

5.  **Notice to Tenants.**  Upon its appointment, the Receiver shall deliver to any tenants or occupants of the Properties written notice that all tenants or occupants shall pay rents and other payments to the Receiver or its designee and that all decisions relating to the Properties will be made by the Receiver. The Receiver may supply a copy of this Order to any tenant or occupant upon request.  Nothing contained in this Order expands any rights of any tenants or occupants.  Nothing contained in this Order, and no conduct by the Receiver, prevents the interests of any tenants, occupants or third-parties from being foreclosed as provided by law.

6.  **Accountings.**  The Receiver shall file monthly accountings with the Court.  Such accountings shall be filed within 15 days after the end of each month.  The Receiver shall file a final accounting prior to discharge of the Receiver.  The Receiver shall mail copies of the monthly accountings and final accounting to all parties who appear in this lawsuit.

7.  **Termination.**  The Receiver shall serve until further order of this Court terminating the receivership.  The Receiver may file a motion seeking to terminate its obligations under this Order on an expedited basis.  Following termination, the Receiver shall file its final accounting and, upon approval by the Court, shall be discharged.

8.  **Borrower's Duties.**  The Borrowers and their agents, representatives, successors, and assigns, shall immediately:

a.  Surrender to the Receiver physical possession of all of the assets and operations related to the Properties;

b.  Provide the Receiver with all keys, codes, passwords, other access devices and manuals, relating to the Properties;

c.    Deliver to the Receiver all information, documents, records, computers, access codes, accounts, and cash in their possession, custody or control relating to the operation, ownership or management of the Properties whether maintained electronically or otherwise, including without limitation operations files, maintenance files, employee records, insurance records, contracts, leases, financial records, security deposits, credit card receipts, advance payments, escrows, bank statements, cancelled checks and ledgers; and

d.    Cooperate and assist the Receiver so as to enable the Receiver to assume and discharge its duties under this order.

9.    **Employment of the Borrowers' Employees.**  The Receiver, in its discretion, may hire any of the Borrowers' employees if the Receiver deems it necessary or appropriate. The Receiver will be not be bound by the Borrowers' employment contracts, collective bargaining agreements, or employment practices, policies or benefits.

10.    **Licenses and Permits.**  The Receiver may utilize, and the Borrowers shall deliver to the Receiver, any and all of the Borrowers' existing sales, use, leasing and operating licenses and permits.

11.    **Receiver's Liability.**  The Receiver shall not be liable for the Borrowers' debts and obligations.  Liabilities incurred by the Receiver in its capacity as Receiver shall be liabilities of the receivership estate and not liabilities of the Receiver or its employees or agents.

12.    **Compensation and Expenses.**  The court reserves the issue of compensation of the receiver.  The court has insufficient information to make a determination as to the appropriate compensation in light of the various duties which will be undertaken by the receiver

and the difficulty involved in performing those duties. The parties shall provide to the court information as to the usual rate of compensation in the market and a rationale for establishing such compensation. Upon the receipt of further information from the parties, the court will again consider the issue of compensation and make an appropriate order.

13. **Direct Payments.** Plaintiff may, but shall not be obligated to, directly compensate the Receiver for its fees and reimburse the Receiver for its expenses, all of which compensation and reimbursements shall be treated in the same manner as advances described previously in this order.

14. **No Limitation on the Plaintiff's Rights.** Nothing contained in this order limits any right or remedy available to Plaintiff, including without limitation Plaintiff's right to foreclose the Mortgages as permitted by applicable law.

15. **Funds Already Collected.** Plaintiff shall immediately turn over to the Receiver all rents and profits in its possession and collected by it from the operation of the Newport Property after the date of the commencement of this action, which the Receiver shall use in the discharge of its duties related to the Newport Property.

16. **Sheriff.** Upon the Receiver's request, the Sheriff of Washington County shall accompany the Receiver while the Properties, and the documents and assets described herein, are turned over to the Receiver and shall assist the Receiver to the extent necessary to allow the Receiver to exercise its powers and carry out its duties under this order in a safe and effective manner.

17. **Termination of Receiver by Reinstatement under Minn. Stat. § 580.30.** For each property, the appointment of a receiver under this Order shall terminate if the property is reinstated under Minn. Stat. § 580.30 by:

- Payment to Commerce Bank of all default interest based on a default date of February 11, 2010 to the date of reinstatement.

- Payment of $17,415.84 to Commerce Bank as one-half of Commerce Bank's legal costs billed through August 25, 2010.

- Providing proof that all judgments and liens against the Properties have been satisfied or have not yet resulted in a final legal determination of validity.

- Providing proof to Commerce Bank that all real estate taxes, including penalties and interest, have been paid.

- Providing proof to Commerce Bank that all utility bills are current.

- Providing proof of payment of all of the Receiver's fees on the reinstated property.

- Providing proof of insurance coverage as required by the loan documents and reimbursing Commerce Bank for any costs incurred procuring insurance.

- Providing all documentation necessary to cure Newport and Forest Lake's nonmonetary defaults:

  o Delivery of Newport's Most Recent Financial Statements in accordance with § 4.02(h)(i) of the Loan Agreement.

  o Delivery of Newport and Hyder Jaweed's most recent state and federal income tax returns in accordance with § 4.02(h)(iii) of the Loan Agreement.

  o Delivery of Hyder Jaweed's most recent personal financial statement in accordance with § 4.02(h)(iv) of the Loan Agreement.

  o Delivery of proof that Newport satisfies the debt service coverage ratio set forth in § 4.02(j) of the Loan Agreement.

18.    In the event of reinstatement, "the mortgage shall be fully reinstated and further proceedings in such foreclosure shall be thereupon abandoned." Minn. Stat. § 580.30.

19.    Accordingly, upon adequate proof of reinstatement, Plaintiff's claims for foreclosure (Counts I and II of Plaintiff's Complaint) shall be dismissed without prejudice to Plaintiff's rights to commence future foreclosure proceedings based on other defaults under the parties' loan agreements.

20.    That the attached memorandum is incorporated herein by reference.

21.    That the Washington County Court Administrator shall serve a true and correct copy of this Order by U.S. Mail to counsel for the parties. Such mailing shall constitute due and proper service of this Order for all purposes.

Dated: _Oct. 20, 2010_

Gary R. Schurrer
Judge of Washington County District Court

**<u>MEMORANDUM</u>**

**Commerce Bank v. Newport Investments, Inc., et al.**

Plaintiff Commerce Bank brings this motion to appoint a receiver for two apartment complexes, one in Newport, Minnesota and one in Forest Lake, Minnesota. The complexes are operated by Defendant Newport Investments, LLC and Forest Lake Housing Associates, LLC. Defendant Hyder Jaweed signed loan agreements and various other documents, including a personal guarantee, on behalf of both entities. Both entities are subject to assignment of rent clauses in favor of Plaintiff. Defendant opposes the appointment of a receiver and seeks to redeem the Newport property only by asking the court to determine the appropriate amount to be paid to redeem the property. The court finds that Plaintiff is entitled to the immediate appointment of a receiver and will provide direction as to the requirements to be met to redeem the property.

The Plaintiff makes a number of arguments in relation to the appointment of a receiver in this matter. The court concludes that Minn. Stat. § 576.01 subd. 2 mandates the appointment of a receiver if certain conditions are met, as they are in this case. Minn. Stat. § 576.01 subd. 2 provides that:

Subd. 2.**Mortgage appointments.**

A receiver shall be appointed in the following case:

After the first publication of notice of sale for the foreclosure of a mortgage pursuant to chapter 580, or with the commencement of an action to foreclose a mortgage pursuant to chapter 581, and during the period of redemption, if the mortgage being foreclosed secured an original principal amount of $100,000 or more or is a lien upon residential real estate containing more than four dwelling units and was not a lien upon property which was entirely homesteaded, residential real estate containing four or less dwelling units where at least one unit is homesteaded, or agricultural

1

property, the foreclosing mortgagee or the purchaser at foreclosure sale may at any time bring an action in the district court of the county in which the mortgaged premises or any part thereof is located for the appointment of a receiver; provided, however, if the foreclosure is by action under chapter 581, a separate action need not be filed. Pending trial of the action on the merits, the court may make a temporary appointment of a receiver following the procedures applicable to temporary injunctions under the Rules of Civil Procedure. If the motion for temporary appointment of a receiver is denied, the trial of the action on the merits shall be held as early as practicable, but not to exceed 30 days after the motion for temporary appointment of a receiver is heard. The court shall appoint a receiver upon a showing that the mortgagor has breached a covenant contained in the mortgage relating to any of the following:

(1) application of tenant security deposits as required by section 504B.178;

(2) payment when due of prior or current real estate taxes or special assessments with respect to the mortgaged premises, or the periodic escrow for the payment of the taxes or special assessments;

(3) payment when due of premiums for insurance of the type required by the mortgage, or the periodic escrow for the payment of the premiums;

(4) keeping of the covenants required of a landlord or licensor pursuant to section 504B.161, subdivision 1.

The receiver shall be an experienced property manager. The court shall determine the amount of the bond to be posted by the receiver.

The mortgage in this case secures a loan for $2,960,000.00. The properties consist of more than four units, are not homesteaded and are not agricultural property. The specific language of the statute requires that a receiver be appointed "upon a showing that the mortgagor has breached a covenant contained in the mortgage related to any of the following: ... (2) payment when due (emphasis added) of prior or current real estate taxes or special assessments..." Although Defendant has stated that it "stands ready" to pay the real estate taxes in order to redeem the Newport property, the Defendant agrees that the taxes have not been paid, which constitutes a breach of the covenants in the mortgage and related agreements, mandating the appointment of a receiver pursuant to the statute. It is unnecessary for the court to address other arguments in support of the receivership offered by the Plaintiff (assignment of rents pursuant to

MInn. Stat. § 559.17 subd. 2; danger of loss or material impairment pursuant to Minn. Stat. § 576.01 subd. 1; and contract and common law arguments), although those also mitigate in favor of appointing a receiver.

Defendant has asked that the court determine what amount of money it must pay to reinstate the mortgage on the Newport property. In addition to providing proof of payment of real estate taxes and penalties which form the basis for the appointment of the receiver, there are several other steps which must be taken by the Defendant to reinstate the mortgage pursuant to Minn. Stat. § 580.30. These steps are set forth in the court's order and include proof that judgments and liens against the property have been satisfied, proof that all utility bills are current, that insurance coverage is in effect and that necessary documentation is provided pursuant to the affirmative covenant provisions contained in paragraph 4.02 of the loan agreement. The court will not require that Defendant provide proof that all tenant security deposits be placed into an escrow account. The court has been unable to find any provision in the Newport mortgage which provides for such a deposit. Defendant agrees that it remains bound by Minn. Stat. § 504B.178 in regard to tenant security deposits.

One of the conditions with which the Defendant must comply before reinstatement of the mortgage is the payment of default interest. Defendant seeks an order from the court establishing the amount of default interest it must pay. Defendant claims that it should pay no default interest. Plaintiff has submitted several different scenarios based upon the default interest beginning to accrue on October 16, 2008, November 15, 2009 or February 10, 2010. The promissory note provides for a base interest rate of 6.5%. Section 2.02 of the loan agreement provides for an additional 3%

3

to be added in the event of a default. Section 5.01 of the loan agreement defines an Event of Default to include when "the Borrower...shall fail to duly perform any of the terms, covenants or agreements contained in the Loan Documents...for a period of 30 days after written notice." The court finds that the written notice of default was dated January 11, 2010. Therefore, default interest should begin to accrue effective February 10, 2010, thirty days after the written notice of default. The court will not calculate the amount to be paid as default interest continues to accrue until the Defendant reinstates the mortgage. However, when calculating the default interest, the parties shall use an effective date of February 10, 2010.

Pursuant to Minn. Stat. § 580.30, Defendant is also obligated to pay one-half of the Plaintiff's attorney fees in order to reinstate the mortgage. The Plaintiff has already set off the sum of $17,415.84, representing one-half of their attorney's fees through August 25, 2010, pursuant to the Second Supplemental Affidavit of Brian Mallak.

Jensen: (00:03:54) I'm sorry, just one quick one. You mentioned that you were going to sell one property and try to refinance Forest Lake. Is your intent here to sell the Newport property?

Jaweed: That is correct.

Jensen: Do you have any backup plans if that plan falls through right now as you sit here?

Jaweed: No. Let's hope that it doesn't fall through. (00:03:27)

Ali: Because we are working with several people; hopefully it goes through ___ (inaudible 00:03:23).

MF: Oh, have you hired a realtor? Have they listed it? Have you done anything like that to get the word out that you are selling?

Jaweed: We haven't formally listed anything yet, but we working on that. If nothing comes through like let's say the end of this week, then we probably go that route. (00:03:04)

MF: If you hire a realtor, you need to –

Jaweed: (inaudible)

MF: Yes, and get their employment approved. Anyone have any other questions? Ms. Thompson? Okay, that concludes the meeting in both cases. Thank you all for coming.

(the recorder was still one – for another 2:15 minutes)



EXHIBIT
C

# Richard G. Jensen

Hi, Cindy. My client is not sure what a telephone conference would accomplish without first getting documentation from the proposed buyer. Without it, there would not be much to talk about. Usually, a borrower who is trying to establish a new lending relationship approaches the lender with as complete of a package as possible (i.e. financial statements, tax returns, projections, business plan, information about the borrower's experience, etc.) in an attempt to instill some confidence on the part of the lender. Also, the seller is generally not involved in the discussions between the lender and the borrower concerning the potential for a lending relationship.

Without having received anything from this proposed buyer, my client has significant concerns about the buyer and transaction in general. Accordingly, I think your client's decision to suggest that the buyer explore alternative financing arrangements is a very good idea. If there is anything that my client or I can do to assist in this endeavor, please contact me as soon as possible.

Thank you. Dick

---

**From:** Moyer, Cynthia [mailto:cmoyer@fredlaw.com]
**Sent:** Friday, January 28, 2011 2:19 PM
**To:** Richard G. Jensen; Cutler, Clinton
**Cc:** Ted Roberts
**Subject:** RE: Commerce/Newport-Proposed Sale??

Dick -- We talked to the client this afternoon. They are working on getting you the information you request below. They also said that the buyer and the buyer's broker are willing to do a telephone call with the bank but our client would like to be involved as well. If your client would like to have a such telephone call, let us know and we will let our client know so that it can be arranged. It sounds like the buyer's agent, our client and your client may have had one telephone call already. Our client is also going to suggest to the buyer that he consider arranging financing from another source in case a transaction with Commerce Bank does not come to pass.

Thanks.

Cindy Moyer

**Cynthia A. Moyer**
**Fredrikson & Byron, PA**
**200 South Sixth Street, Suite 4000**
**Minneapolis, MN 55402**
**DIRECT:** 612.492.7167
**FAX:** 612.492.7077
**EMAIL:** cmoyer@fredlaw.com
**ASSISTANT:** Cindy Thomas, 612.492.7562

**This is a transmission from the law firm of Fredrikson & Byron, P.A. and may contain information which is privileged, confidential, and protected by the attorney-client or attorney work product privileges. If you are not the addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this transmission in error, please destroy it and notify us immediately at our telephone number 612.492.7000.**

**IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code, or (b) promoting, marketing, or re[...] matters addressed herein.

1

EXHIBIT

D

Please consider the environment before printing this email.

**From:** Richard G. Jensen [mailto:RJensen@fwhtlaw.com]
**Sent:** Thursday, January 27, 2011 5:53 PM
**To:** Cutler, Clinton; Moyer, Cynthia
**Cc:** Ted Roberts
**Subject:** Commerce/Newport-Proposed Sale??

Clint and Cindy:

I just got off the phone with my client. My client still has had no contact from the proposed buyer and knows nothing about him, other than that he is apparently a doctor from Chicago who has never owned this type of property before. My client does not know who this proposed buyer is, why he is proposing to purchase an apartment building in Newport, Minnesota, what his business plan is, what his financial condition is, who he plans to have manage the property, and what his relationship is to Hyder Jaweed and Asghar Ali. Also, my client has not received a signed loan application or the other documentation requested in my previous e-mail.

I am directing my criticism at your client, not you, but if this were a legitimate transaction, the proposed buyer would presumably show at least some interest in contacting the bank from whom he intends to seek financing.

My client has no application in front of it and is not in a position to make even a preliminary decision concerning whether it might consider providing any financing for a sale to this buyer. However, if a legitimate buyer, application and proposed sale were presented to my client, I would suspect that my client would require at least the following. First, it appears that the buyer proposes paying cash of $300,000, with $60,000 in the form of earnest money. Presumably, approximately $150,000 of the down payment would be used to pay past-due real estate taxes, and the remaining $150,000 would be used to pay down the loan. Second, I strongly suspect that my client would request more earnest money, which would be forfeited to my client if the transaction does not close. Approximately $150,000 (still less than 5% of the purchase price) in earnest money would be more reasonable. Third, in light of the large amount in default, I suspect that my client would want to see a larger portion of the purchase price paid in cash. Finally, to clarify the amount owed to my client, my client is owed approximately $2,850,000, calculated as follows:

- Principal               $2,700,000
- Regular interest        $5,000
- Default interest        $75,000
- Attorneys' fees         $70,000

I be available to discuss this matter tomorrow morning. However, I wanted to get my comments to you as soon as possible.

Thank you.  Dick

Richard G. Jensen
FABYANSKE, WESTRA, HART
& THOMSON, P.A.
800 LaSalle Avenue, Suite 1900
Minneapolis, MN  55402
Ph.:   (612) 359-7600
Fax:   (612) 338-3857
Direct: (612) 359-7603
e-mail: rjensen@fwhtlaw.com
www.fwhtlaw.com

This message is intended only for the individual or entity to whom it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable law.  If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message is strictly prohibited, and you are requested to:  notify the sender immediately by either e-mail or telephone; and return the original message to the sender at the above address.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                    Case No. 10-47910

Newport Investments, LLC,                                 Chapter 11
Case

         Debtor.

## DECLARATION OF BRIAN MALLAK

         Brian Mallak, being first duly sworn on oath, states:

         1.      I am a senior vice-president of Commerce Bank.  I handled the loan

transaction between Commerce Bank and the debtor, Newport Investments, LLC.

I have personal knowledge of the facts stated in this declaration.

         2.      Pursuant to a loan agreement dated June 6, 2008, Commerce Bank

loaned Newport $2,969,000 to purchase the property that is Newport's most

significant asset in this case -- an apartment complex in Newport, Minnesota,

containing 53 rental units.  The loan is secured by, among other things, a mortgage

in the property.

         3.      Newport purchased the real property, and related personal property,

on June 6, 2008, for a total purchase price of $3,090,000.  A certified copy of the

deed conveying the property to Newport, together with the associated certificate of

real estate value, obtained from the Washington County Recorder is attached

hereto as **Exhibit A.**

4.     Copies of the tax summaries for the four tax parcels that comprise the property are attached hereto as **Exhibit B**. Those summaries demonstrate that since purchasing the property, Newport has never made a payment of real estate taxes.

5.     Upon Newport's default, the loan provides for the recovery of default interest at the rate of 3.0% above the regular rate of interest.

6.     As of October 25, 2010, the date of the filing of Newport's bankruptcy petition, Newport was indebted to Commerce Bank as follows: principal of $2,699,230.94; regular interest of $4,884.41; default interest of $52,284.86; and costs of collection, including attorneys fees.

7.     As of October 25, 2010, Newport was in default under the loan and mortgage, and Newport remains in default under the loan and mortgage, by, among other things, failing to pay real estate taxes and other amounts due and owing pursuant to the loan and mortgage.

8.     Past-due real estate taxes and penalties owing on the property currently total $147,632.35.

9.     Newport currently owes default interest on the loan from Commerce Bank in the amount of approximately $75,000. Default interest continues to accrue at the rate of approximately $225 per day.

10.     From February 2010 through approximately October 25, 2010, Commerce Bank collected rents generated from the property. The monthly

amounts collected by the bank are set forth on the spreadsheet attached hereto as **Exhibit C**.

11.    On January 21, 2011, I received a purchase agreement for the property apparently signed, as buyer, by a person named Syed M. Raza. A copy of this purchase agreement is attached hereto as **Exhibit D**. The purchase agreement states in part:

> 3.1.    Buyer Contingencies. Buyer's obligations to Close and purchase the property are contingent upon the waiver or satisfaction of each of the following conditions precedent on or before the first business day which is 20 days after the date of Seller's Delivery Notice is referred to herein as the "Contingency date. [sic]
>
> *   *   *
>
> (c)    Financing.  On or before the Contingency Date, Buyer will have obtained financing with terms acceptable to Buyer from Commerce Bank in Buyer's sole and absolute discretion.

12.    Notwithstanding the fact that this condition precedent to sale requires Commerce Bank to agree to finance the buyer's purchase of the property, Commerce Bank has not been contacted by the buyer. Instead, on January 14, 2011, a person delivered to me a package containing W-2 forms and tax returns for the buyer for the years 2008 and 2009, and two apparent investment account statements for the buyer. To this date, Commerce Bank has not been contacted by the buyer or anyone on his behalf.

13.    On January 28, 2011, Commerce Bank's counsel received an e-mail from Newport's counsel stating that the buyer and his broker "are willing" to

3

participate in a telephone call with Commerce Bank, but Newport wants to be involved as well.

14.     The approach that the potential buyer and Newport have taken to this transaction has been highly unusual, including:

- The potential buyer has not contacted Commerce Bank to discuss financing the transaction even though the purchase agreement is contingent upon Commerce Bank agreeing to finance the transaction;

- The potential buyer has not provided to Commerce Bank any kind of a loan application, business plan, projections, statement of relevant experience, etc.;

- The purchase agreement provides that Seller and Buyer will pro-rate to the Closing on a per diem basis all Taxes payable in **2008**, and requires the buyer to pay all taxes for subsequent years.

- To this point, Commerce Bank has no knowledge of why the potential buyer, an individual from Illinois, would be interested in buying distressed real estate in Newport, Minnesota;

- The limited information that Commerce Bank has regarding the potential buyer does not indicate that the potential buyer has any experience owning or operating apartment buildings; and

- Newport demanded to be involved in any discussions between the potential buyer and Commerce bank.

Based upon the foregoing, Commerce Bank has serious concerns about the transaction and the potential buyer.

15.     I have reviewed the cash flow projections that Newport has provided for February through April 2011. Those projections do not account for a number of factors that would affect the cash flow for the property during these month, as well as future months, including:

4

- The projections do not appear to account for vacancies or credit losses that are almost certain to occur;

- Newport projects that legal and accounting professional fees will be $5,500 per month, which appears to be inconsistent with past professional fees incurred by Newport in the case;

- The projections fail to include any reserves for capital expenditures, such as repair and replacement of roofs, carpets, windows, appliances, mechanical systems, etc., and do not budget for maintenance expenses (other than a rent credit for a tenant apparently to perform maintenance work) even though the property consists of three apartment buildings built in 1971;

- The projections include nothing for snow removal during the three months covered by the projections (and thereafter, lawn care and landscaping costs will be incurred);

- The projections do not account for bank charges;

- The projections do not account for the accrual of interest and penalties on unpaid taxes and the accrual of default interest on Commerce Bank's loan; and

- The projections do not account for repayment of any principal due on Commerce Bank's loan or the unpaid real estate taxes.

16.    Based upon all of the foregoing, Commerce Bank would not be willing to finance the transaction contemplated by the purchase agreement received from Newport. Also, under these circumstances, Commerce Bank would not support a plan of reorganization providing for continued operation of the business.

17. A copy of the rent roll for the property that was provided to

Commerce Bank by Newport is attached hereto as **Exhibit E**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9ᵗʰ, 2011

Brian Mallak

**3697170**

Receipt#: 72297

WAR            $46.00
SDT          $10,197.00
Conservation Fee:  $5.00
CRV Filed
No Delinquent Taxes
Transfer Entered

Return to:
COMMERCIAL PARTNERS TITLE
200 SOUTH 6TH STREET
SUITE 1300
MINNEAPOLIS MN 55402

Certified Filed and/or recorded on:
6/18/2008  2:35 PM

**3697170**

Office of the County Recorder
Property Records & Taxpayer Services
Washington County, MN

*Kevin J Corbid, County Recorder*
*Molly O Rourke, Auditor Treasurer*

*.0018*
*.0019*
*36.028.22.21.0020*
*36.028.22.21.0002*

*30751 ④ KJ*

## WARRANTY DEED

STATE DEED TAX DUE HEREON: $ _10,197.00_

Date: June 6, 2008

FOR VALUABLE CONSIDERATION, Newport Ponds, a Partnership organized under the laws of the State of Minnesota, Grantor hereby conveys and warrants to Newport Investments, LLC, a limited liability company organized under the laws of the State of Minnesota, Grantee, real property in Washington County, Minnesota, described as follows:

See attached Exhibit A

together with all hereditaments and appurtenances belonging thereto, subject to the following exceptions: Building and zoning laws, ordinances, state and federal regulations; restrictions relating to use or improvement of the property without effective forfeiture provision; reservation of any minerals or mineral rights to the State of Minnesota; utility and drainage easements which do not interfere with present improvements; rights of tenants, if any.

Check if applicable:
  ✓  The Seller certifies that the Seller does not know of any wells located on the above described real property.
  ___  A well disclosure certificate accompanies this document.
  ___  I am familiar with the property described in this instrument and I certify that the status and number of wells on the described real property have not changed since the last previously filed well disclosure certificate.

Metro Legal Services
COMPAT 30751 A
894889 WD 56403

Office of County Recorder  } SS
Washington County, Minnesota

I hereby certify that the within instrument was filed at this Office at Stillwater for record on the 18 day of June A.D. 2008 at 2:35 o'clock P.M., and was duly recorded in Washington County Records. I have hereunto set my hand and affixed the official seal at Stillwater, in said county this ___ of Feb. A.D. 2011

KEVIN J. CORBID
County Recorder

by _____ Deputy

EXHIBIT
A

# EXHIBIT A

## LEGAL DESCRIPTION

Parcel 1:

All that part of Lots 2 and 3, Newport Acres, described as follows:

Beginning at a point in the West line of said Lot 3, 29.89 feet North of the Southwest corner thereof; thence East parallel to the South line of said Lot 3, 240 feet to a point; thence Northwesterly 174 feet to a point that is 200 feet East of the West line of said Lots 2 and 3; thence West 200 feet to a point on the West line of said Lot 2; thence South 170 feet to the point of beginning.

Washington County, Minnesota
Abstract Property

Parcel 2:

The South 180 feet of Lot 16; and the South 180 feet of Lot 17; of Newport Acres, in the Village of Newport, Washington County, Minnesota.

Abstract Property

Parcel 3:

All that part of Lots 3, 16, 17 and 18, Newport Acres, described as follows:

Beginning at a point in the West line of said Lot 16, 180 feet North of the Southwest corner thereof; thence East parallel to the South line of said Lots 16, 17 and 18, 255 feet to a point; thence Northwesterly 172 feet to a point that is 240 feet east of the west line of said Lots 3 and 16; thence west 240 feet to a point on the west line of said Lot 3; thence south 170 feet to the point of beginning.

Washington County, Minnesota
Abstract Property

# Certificate of Real Estate Value

**PE20**

Auditor use only
*109430*

61 18

| Names of buyers (last, first, MI) | Address | | Daytime phone |
|---|---|---|---|
| *Newport Investments, LLC* | 3 Blue Spruce Ct North Oaks MN 55127 | | 612-414-0897 |

| Names of sellers (last, first, MI) | New address | City or township | Daytime phone |
|---|---|---|---|
| *Newport Ponds* | 4010 West 65th St Edina MN 55435 | Mike + Don Garbis | 952 848 0401 |

| Street address or rural route of property purchased | | County |
|---|---|---|
| 1624, 1620, 1610 10th Ave So. Newport | | Washington |

| **1.** Date of deed or contract | Legal description of property purchased (lot, block and plat) or attach 3 copies of the legal description |
|---|---|
| 6/6/08 | Attached |

## Financial arrangements

| **2.** Total purchase price | Was personal property included in purchase price (e.g., furniture, inventory, equipment)? |
|---|---|
| $3,090,000.00 | ☑ Yes ☐ No  If yes, list property and |

**3.** Down payment

current (not replacement) value at right, and enter $_____
total in Box 5 below. Use back of form if needed. $_____

**4.** Points or prepaid interest paid by seller

**5.** Current value of personal property
$106,000.00
$_____
$_____
$_____

## 6. Type of acquisition (check all that apply)

- ☐ Buyer and seller are relatives or related businesses
- ☐ Buyer or seller is religious or charitable organization
- ☐ Buyer or seller is unit of government
- ☐ Buyer purchased partial interest only
- ☐ Contract paid off or resold
- ☐ Name added or removed from deed
- ☐ Property condemned or foreclosed upon
- ☐ Property received as gift or inheritance
- ☐ Property received in trade
- ☐ Purchase agreement signed over two years ago

## 7. Type of property transferred (check all that apply)

- ☐ Land only
- ☑ Land and buildings
- ☐ Construction of new building after Jan. 1 of year of sale

## 8. Planned use of property (check one)

- ☐ Residential: single family
- ☐ Residential: duplex, triplex
- ☐ Cabin or recreational (noncommercial)
- ☐ Agricultural. Number of acres: _____ *(attach Schedule PE20A).*
- ☑ Apartment (residential, four or more units). Number of units: 23 *(attach Schedule PE20A).*
- ☐ Commercial-industrial. Type of business: _____ *(attach Schedule PE20A).*
- ☐ Other. Describe: _____ *(attach Schedule PE20A).*

**8a.** Will this property be the buyer's principal residence? ☐ Yes ☑ No

## Method of financing (complete only if seller-financed, including contracts-for-deed and assumed mortgages)

| | Assumed mortgage | Contract for deed | Mortgage or contract-for-deed amount at purchase | Monthly payment (principal & interest) | Interest rate now in effect | Number of payments | Date of any lump-sum (balloon) payments |
|---|---|---|---|---|---|---|---|
| **9.** | ☐ | ☐ | | | | | |
| **10.** | ☐ | ☐ | | | | | |

JCS CAMA 7.8.08

## Sign here. *I declare under penalty of law that the information on this form is true, correct and complete to the best of my knowledge and belief.*

| Print name | Signature | Date | Daytime phone |
|---|---|---|---|
| Hyder Jaweed | | 6/6/08 | (___) ___-0897 |

## Counties: Complete this section.

| A | C | Newport | 023 | 00 | Land | 221,700 | Bldg | 1,787,700 | Tot | 2,009,400 | Primary property ID number 30.028.22.21.0020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Acres | Tillable | CER | CRP RIM | Use 02 WH/C | Deed | Yr | Land | Bldg | | | Secondary parcel ID number b. .0018 |

Good for study ☑ Yes ☐ No  If no, give reason/code

Ru 6/24/08

| X | HC | ST | Adjs | Adjs | | Use 600 | Tillable EMV | | Apt 23 | FM | c. .0019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | GA | C | 1 | MV | | 2 | MV | 2,984,000 | | | d. .0002 |

Are there more parcels? ☐ Yes ☐ No

| 02 | CT | 1200 | PT | Date 02/6/08 | W | M | S | 3,090,000 | Put additional ID numbers on back of form. 3697170.01 |
|---|---|---|---|---|---|---|---|---|---|

Stock No. 6000400 (Rev. 5/04)

917017

MINNESOTA · REVENUE                                                    **PE20A**

# Certificate of Real Estate Value Supplemental Schedule

Complete this form for apartment, commercial/industrial or farm sales only.

Name of buyer: *Newport Investments LLC*

Form PE20 (Cert. of Real Estate Value) sequence number: *917017*

**1** If the sale price included personal property *(e.g., furniture, appliances, supplies, fixtures, machinery or stock inventories)* or other items *(e.g., business's goodwill, business's name, franchise, or non-compete agreement),* enter total value of items. ..................... $_____

**2** If you or the seller paid someone to do an appraisal of the property's value prior to sale, check this box ☑
If known, enter appraised value ............. $_____

**3** **Commercial/industrial properties:**
From the property uses on the back, enter the code that best describes the property's use:
■ before the sale .................................. ____
■ after the sale .................................. ____

**4** **Apartment properties:**
Enter the number of:
■ apartment buildings included in sale price .. *3*
■ rental units in all buildings ...................... *53*

**5** **Farm properties:**
How many acres are:
■ irrigated ..................................... ____
■ enrolled in Reinvest in Minnesota (RIM) ..... ____
■ enrolled in Conservation Reserve Program (CRP) ..................................... ____
■ enrolled in Conservation Reserve Enhancement Program (CREP)? ................. ____

**All properties**

**6** Did you own property adjacent to the property purchased? .................................. ☐ Yes ☑ No
If yes, in your opinion, did you pay a higher price for the property than other potential buyers would have paid? .............. ☐ Yes ☐ No

**7** Does the total purchase price from line 2 of Form PE20 include other properties sold to you at the same time? ........................... ☐ Yes ☑ No

**8** Did you lease the property from the seller before the purchase? ................. ☐ Yes ☑ No
If yes, did you have an option to buy? ......... ☐ Yes ☐ No

Did the seller lease the property from you after the purchase? ........................... ☐ Yes ☑ No
If yes, what was the term of the lease in months ................................................ _____

**9** Was the sale announced and/or promoted through realtor listings, newspaper or other publications, advertisements, brochures, or other promotional or informational mailings? ........................................... ☑ Yes ☐ No
If no, how did you learn that the property was for sale? _____
_____
_____
_____

**10** If the property was rental property, were you guaranteed a minimum level of rental income? ................................................... ☐ Yes ☑ No

**11** Were you and the seller family members, business partners, business affiliates, a subsidiary to the other, joint owners of the property or stockholders of the business? .. ☐ Yes ☑ No

**12** When the property was sold, was a foreclosure, court judgment, order or other legal proceeding pending in connection with the property? ..................................... ☐ Yes ☑ No

**13** In your opinion, was the property sold for a considerably different price from what you believe other similar properties would sell for? ......................................... ☐ Yes ☑ No
If yes, explain briefly: _____
_____
_____

**Sign here.** *I declare under penalty of law that the information on this form is true, correct and complete to the best of my knowledge and belief.*

Signature of buyer: _____    Print name: _____    Date: _____    Daytime phone: _____

Mail to your county auditor's or recorder's office with Form PE20 and your deed or contract-for-deed.

Stock No. 6000401 (Rev. 5/04)

# EXHIBIT A
## LEGAL DESCRIPTION

Parcel 1:

All that part of Lots 2 and 3, Newport Acres, described as follows: *36.028.22.21.0002*

Beginning at a point in the West line of said Lot 3, 29.89 feet North of the Southwest corner thereof; thence East parallel to the South line of said Lot 3, 240 feet to a point; thence Northwesterly 174 feet to a point that is 200 feet East of the West line of said Lots 2 and 3; thence West 200 feet to a point on the West line of said Lot 2; thence South 170 feet to the point of beginning.

Washington County, Minnesota
Abstract Property

Parcel 2: *36.028.22.21.0018 & 36.028.22.21.0019*

The South 180 feet of Lot 16; and the South 180 feet of Lot 17; of Newport Acres, in the Village of Newport, Washington County, Minnesota.

Abstract Property

Parcel 3: *36.028.22.21.0020*

All that part of Lots 3, 16, 17 and 18, Newport Acres, described as follows:

Beginning at a point in the West line of said Lot 16, 180 feet North of the Southwest corner thereof; thence East parallel to the South line of said Lots 16, 17 and 18, 255 feet to a point; thence Northwesterly 172 feet to a point that is 240 feet east of the west line of said Lots 3 and 16; thence west 240 feet to a point on the west line of said Lot 3; thence south 170 feet to the point of beginning.

Washington County, Minnesota
Abstract Property

# Washington County Treasurer

Washington County Treasurer
14949 62nd Street North
P.O. Box 200
Stillwater, MN 55082-0200

Phone: (651) 430-6175
Email: taxes@co.washington.mn.us

 Return to
Summary

---

## Tax Summary

**Last Update:** 2/1/2011 1:22:54 AM  CST

**PIN Number: 36.028.22.21.0002**

**Current Owner**
NEWPORT INV LLC
3 BLUE SPRUCE CT
NORTH OAKS MN 55127

**TAG**
5801 NEWPORT-833-SWWS/EM

**Tax Roll : 1 - Real Property**

**Property Address**
1660  10TH AVE

**Property Description**
SubdivisionName NEWPORT ACRES Lot 2 SubdivisionCd
55035

| Tax Bill Totals | |
| --- | --- |
| Current | $23,789.64 |
| Delinquent | $27,380.63 |
| Amount Due | **$51,170.27** |

## Current Year

Tax Year: 2010          Bill Number: 413387          Net Tax Assessment: $20,526.00

| Period | Due Date | Tax | Penalty/Fee | Interest | Total Due |
| --- | --- | --- | --- | --- | --- |
| INST 1 | 5/15/2010 | $10,263.00 | $1,436.82 | $195.00 | $11,894.82 |
| INST 2 | 10/15/2010 | $10,263.00 | $1,436.82 | $195.00 | $11,894.82 |
| | | | | **Total Due:** | **$23,789.64** |

## Delinquents

| Year | Bill Number | Tax | Penalty/Fee | Interest | Total Due |
| --- | --- | --- | --- | --- | --- |
| 2009 | 30960 | $13,846.00 | $1,938.44 | $1,841.52 | $17,625.96 |
| 2008 | 30960 | $7,011.00 | $1,006.54 | $1,737.13 | $9,754.67 |
| | | | | **Total Delinquent** | **$27,380.63** |

## Payments

| Last Paid | Bill Number | Tax Year | Amount Paid | Receipt Number | Paid By |
| --- | --- | --- | --- | --- | --- |
| 05/15/2008 | 30960 | 2008 | $7,011.00 | 0459922-001696342 | |

Tax Assessment for Tax Year  2010

**Tax Year 2010**

**Bill Number: 413387**

**Class Code 1 - Real Property**

| Authority | Gross | Credit | Net Tax |
| --- | --- | --- | --- |
| CITY OF NEWPORT | $6,125.50 | $0.00 | $6,125.50 |

EXHIBIT
B
tabbles

| | | | |
|---|---|---|---|
| ISD 833 SOUTH WASHINGTON | $5,512.48 | $0.00 | $5,512.48 |
| METRO COUNCIL | $93.41 | $0.00 | $93.41 |
| METRO MOSQUITO | $54.41 | $0.00 | $54.41 |
| METRO TRANSIT DIST | $152.31 | $0.00 | $152.31 |
| SP CITY OF NEWPORT | $4,902.82 | $0.00 | $4,902.82 |
| SP WASHINGTON COUNTY | $159.00 | $0.00 | $159.00 |
| SP WS SOUTH WASHINGTON | $111.31 | $0.00 | $111.31 |
| WASHINGTON COUNTY | $3,201.11 | $0.00 | $3,201.11 |
| WASHINGTON COUNTY HRA | $122.24 | $0.00 | $122.24 |
| WASHINGTON COUNTY RRA | $22.03 | $0.00 | $22.03 |
| WS SOUTH WASHINGTON | $69.38 | $0.00 | $69.38 |
| **Net Tax** | | | **$20,526.00** |

The Washington County Property Records and Taxpayer Services Department makes every effort to produce and publish the most current and accurate information possible.   No warranties, expressed or implied, are provided for the data herein, its use, or its interpretation.   If you have any questions, please contact us at (651)430-6175 or Taxes@co.washinton.mn.us.

# Washington County Treasurer

Washington County Treasurer
14949 62nd Street North
P.O. Box 200
Stillwater, MN 55082-0200

Phone: (651) 430-6175
Email: taxes@co.washington.mn.us

 Return to
Summary

---

## Tax Summary

**Last Update:** 2/1/2011 1:22:54 AM  CST

**PIN Number: 36.028.22.21.0018**

**Tax Roll : 1 - Real Property**

**Current Owner**
NEWPORT INV LLC
3 BLUE SPRUCE CT
NORTH OAKS MN 55127

**TAG**
5801 NEWPORT-833-SWWS/EM

**Property Address**
1624  10TH AVE

**Property Description**
SubdivisionName NEWPORT ACRES Lot 16 SubdivisionCd
55035

| Tax Bill Totals | |
|---|---|
| Current | $22,512.42 |
| Delinquent | $27,380.63 |
| **Amount Due** | **$49,893.05** |

## Current Year

Tax Year: 2010        Bill Number: 413485        Net Tax Assessment: $19,424.00

| Period | Due Date | Tax | Penalty/Fee | Interest | Total Due |
|---|---|---|---|---|---|
| INST 1 | 5/15/2010 | $9,712.00 | $1,359.68 | $184.53 | $11,256.21 |
| INST 2 | 10/15/2010 | $9,712.00 | $1,359.68 | $184.53 | $11,256.21 |
| | | | | **Total Due:** | **$22,512.42** |

## Delinquents

| Year | Bill Number | Tax | Penalty/Fee | Interest | Total Due |
|---|---|---|---|---|---|
| 2009 | 30976 | $13,846.00 | $1,938.44 | $1,841.52 | $17,625.96 |
| 2008 | 30976 | $7,011.00 | $1,006.54 | $1,737.13 | $9,754.67 |
| | | | | **Total Delinquent** | **$27,380.63** |

## Payments

| Last Paid | Bill Number | Tax Year | Amount Paid | Receipt Number | Paid By |
|---|---|---|---|---|---|
| 05/15/2008 | 30976 | 2008 | $7,011.00 | 0459923-001696342 | |

Tax Assessment for Tax Year  2010

**Tax Year 2010**

**Bill Number: 413485**

**Class Code 1 - Real Property**

| Authority | Gross | Credit | Net Tax |
|---|---|---|---|
| CITY OF NEWPORT | $6,125.50 | $0.00 | $6,125.50 |

| | | | |
|---|---|---|---|
| ISD 833 SOUTH WASHINGTON | $5,512.48 | $0.00 | $5,512.48 |
| METRO COUNCIL | $93.41 | $0.00 | $93.41 |
| METRO MOSQUITO | $54.41 | $0.00 | $54.41 |
| METRO TRANSIT DIST | $152.31 | $0.00 | $152.31 |
| SP CITY OF NEWPORT | $3,973.02 | $0.00 | $3,973.02 |
| SP WS SOUTH WASHINGTON | $99.61 | $0.00 | $99.61 |
| WASHINGTON COUNTY | $3,199.61 | $0.00 | $3,199.61 |
| WASHINGTON COUNTY HRA | $122.24 | $0.00 | $122.24 |
| WASHINGTON COUNTY RRA | $22.03 | $0.00 | $22.03 |
| WS SOUTH WASHINGTON | $69.38 | $0.00 | $69.38 |
| **Net Tax** | | | **$19,424.00** |

The Washington County Property Records and Taxpayer Services Department makes every effort to produce and publish the most current and accurate information possible.   No warranties, expressed or implied, are provided for the data herein, its use, or its interpretation.   If you have any questions, please contact us at (651)430-6175 or Taxes@co.washinton.mn.us.

# Washington County Treasurer

Washington County Treasurer
14949 62nd Street North
P.O. Box 200
Stillwater, MN 55082-0200

Phone: (651) 430-6175
Email: taxes@co.washington.mn.us

 Return to
Summary

## Tax Summary

**PIN Number: 36.028.22.21.0019**

**Current Owner**
NEWPORT INV LLC
3 BLUE SPRUCE CT
NORTH OAKS MN 55127

**TAG**
5801 NEWPORT-833-SWWS/EM

**Tax Roll : 1 - Real Property**

**Property Address**
0

**Property Description**
SubdivisionName NEWPORT ACRES Lot 17 SubdivisionCd 55035

| Tax Bill Totals | |
|---|---|
| Current | $141.40 |
| Delinquent | $236.33 |
| Amount Due | **$377.73** |

## Current Year

Tax Year: 2010      Bill Number: 413487      Net Tax Assessment: $122.00

| Period | Due Date | Tax | Penalty/Fee | Interest | Total Due |
|---|---|---|---|---|---|
| INST 1 | 5/15/2010 | $122.00 | $17.08 | $2.32 | $141.40 |
| | | | | **Total Due:** | **$141.40** |

## Delinquents

| Year | Bill Number | Tax | Penalty/Fee | Interest | Total Due |
|---|---|---|---|---|---|
| 2009 | 30977 | $104.00 | $14.56 | $13.84 | $132.40 |
| 2008 | 30977 | $53.00 | $32.42 | $18.51 | $103.93 |
| | | | | **Total Delinquent** | **$236.33** |

## Payments

| Last Paid | Bill Number | Tax Year | Amount Paid | Receipt Number | Paid By |
|---|---|---|---|---|---|
| 05/15/2008 | 30977 | 2008 | $53.00 | 0459924-001696342 | |

Tax Assessment for Tax Year 2010

**Tax Year 2010**      **Bill Number: 413487**

**Class Code 1 - Real Property**

| Authority | Gross | Credit | Net Tax |
|---|---|---|---|
| CITY OF NEWPORT | $46.13 | $0.00 | $46.13 |
| ISD 833 SOUTH WASHINGTON | $41.56 | $0.00 | $41.56 |
| METRO COUNCIL | $0.70 | $0.00 | $0.70 |
| METRO MOSQUITO | $0.41 | $0.00 | $0.41 |
| METRO TRANSIT DIST | $1.15 | $0.00 | $1.15 |
| SP WS SOUTH WASHINGTON | $7.09 | $0.00 | $7.09 |
| WASHINGTON COUNTY | $23.35 | $0.00 | $23.35 |

| | | | |
|---|---|---|---|
| WASHINGTON COUNTY HRA | $0.92 | $0.00 | $0.92 |
| WASHINGTON COUNTY RRA | $0.17 | $0.00 | $0.17 |
| WS SOUTH WASHINGTON | $0.52 | $0.00 | $0.52 |
| **Net Tax** | | | **$122.00** |

The Washington County Property Records and Taxpayer Services Department makes every effort to produce and publish the most current and accurate information possible.   No warranties, expressed or implied, are provided for the data herein, its use, or its interpretation.   If you have any questions, please contact us at (651)430-6175 or Taxes@co.washinton.mn.us.

# Washington County Treasurer

Washington County Treasurer
14949 62nd Street North
P.O. Box 200
Stillwater, MN 55082-0200

Phone: (651) 430-6175
Email: taxes@co.washington.mn.us

 Return to
Summary

---

## Tax Summary

**Last Update:** 2/1/2011 1:22:54 AM CST

**PIN Number: 36.028.22.21.0020**

**Tax Roll : 1 - Real Property**

**Current Owner**
NEWPORT INV LLC
3 BLUE SPRUCE CT
NORTH OAKS MN 55127

**Property Address**
1650 10TH AVE

**Property Description**
SubdivisionName NEWPORT ACRES Lot 3 SubdivisionCd
55035

**TAG**
5801 NEWPORT-833-SWWS/EM

| Tax Bill Totals | |
| --- | --- |
| Current | $19,948.70 |
| Delinquent | $26,242.60 |
| **Amount Due** | **$46,191.30** |

### Current Year

Tax Year: 2010          Bill Number: 413335          Net Tax Assessment: $17,212.00

| Period | Due Date | Tax | Penalty/Fee | Interest | Total Due |
| --- | --- | --- | --- | --- | --- |
| INST 1 | 5/15/2010 | $8,606.00 | $1,204.84 | $163.51 | $9,974.35 |
| INST 2 | 10/15/2010 | $8,606.00 | $1,204.84 | $163.51 | $9,974.35 |
| | | | | **Total Due:** | **$19,948.70** |

### Delinquents

| Year | Bill Number | Tax | Penalty/Fee | Interest | Total Due |
| --- | --- | --- | --- | --- | --- |
| 2009 | 30978 | $13,268.00 | $1,857.52 | $1,764.64 | $16,890.16 |
| 2008 | 30978 | $6,721.00 | $965.94 | $1,665.50 | $9,352.44 |
| | | | | **Total Delinquent** | **$26,242.60** |

### Payments

| Last Paid | Bill Number | Tax Year | Amount Paid | Receipt Number | Paid By |
| --- | --- | --- | --- | --- | --- |
| 05/15/2008 | 30978 | 2008 | $6,721.00 | 0459925-001696342 | |

Tax Assessment for Tax Year 2010

**Tax Year 2010**                                                            Bill Number: 413335

**Class Code 1 - Real Property**

| Authority | Gross | Credit | Net Tax |
| --- | --- | --- | --- |
| CITY OF NEWPORT | $5,870.70 | $0.00 | $5,870.70 |

| | | | |
|---|---|---|---|
| ISD 833 SOUTH WASHINGTON | $5,283.16 | $0.00 | $5,283.16 |
| METRO COUNCIL | $89.52 | $0.00 | $89.52 |
| METRO MOSQUITO | $52.15 | $0.00 | $52.15 |
| METRO TRANSIT DIST | $145.97 | $0.00 | $145.97 |
| SP CITY OF NEWPORT | $2,379.04 | $0.00 | $2,379.04 |
| SP WS SOUTH WASHINGTON | $119.47 | $0.00 | $119.47 |
| WASHINGTON COUNTY | $3,067.23 | $0.00 | $3,067.23 |
| WASHINGTON COUNTY HRA | $117.16 | $0.00 | $117.16 |
| WASHINGTON COUNTY RRA | $21.11 | $0.00 | $21.11 |
| WS SOUTH WASHINGTON | $66.49 | $0.00 | $66.49 |
| **Net Tax** | | | **$17,212.00** |

The Washington County Property Records and Taxpayer Services Department makes every effort to produce and publish the most current and accurate information possible.   No warranties, expressed or implied, are provided for the data herein, its use, or its interpretation.   If you have any questions, please contact us at (651)430-6175 or Taxes@co.washinton.mn.us.

| | February 2010 | March 2010 | April 2010 | May 2010 | June 2010 | July 2010 | August 2010 | September 2010 | October 2010 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| $ | 30,227.50 | $ 31,894.00 | $ 24,887.97 | $ 26,414.00 | $ 31,932.00 | $ 20,082.17 | $ 28,073.68 | $ 28,250.33 | $ 21,956.00 | $ 243,717.65 |



EXHIBIT

C

exhibitsticker.com

# PURCHASE AGREEMENT

## (Newport Investment, LLC)

This Agreement, dated as of January 20, 2011 (the "Effective Date"), is between Newport Investments, a Minnesota Limited Liability Corporation ("Seller"), Syed Raza, ("Buyer").

The parties mutually agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF PROPERTY

1.1    Property Sold. Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, subject to the terms, covenants and conditions set forth herein, all of the following property (collectively, the "Property"):

(a)    Real Property. That certain real property and all improvements, including, but not limited to a residential apartment building containing 53 rental units commonly known as "Newport Ponds" located at 1624, 1650 and 1660 10th Avenue Southwest, in the City of Newport, Washington County, State of Minnesota, as more particularly described in **Exhibit A** attached hereto and made a part hereof, together with (1) all parking lots, sidewalks, landscaping and other improvements located thereon, and (2) all rights, benefits, privileges, easements, tenements, herditaments, rights-of-way and other appurtenances thereon or in any way appertaining thereto (collectively, the "Real Property").

(b)    Leases. All of Seller's interest in and to all leases for the Real Property as listed on the rent roll, all pro-rated rents payable at Closing, and all rents payable after the Closing; plus any tenant security deposits and required interest, if any, at or prior to Closing (herein collectively the "Security Deposits").

(c)    Documents. Copies of the following, if in Seller's possession, or if in the possession of Seller's Manager: architectural and engineering plans; soil studies; environmental reviews; service and maintenance contracts; inspection reports relating to the operation or condition of the Property; and any surveys ("Documents").

(d)    Records. Records currently in the possession of Seller or Seller's Manager regarding the Real Property management, insurance, maintenance, repairs, warranties, capital improvements and services (including, without limitation, all Tenant and Lease files) ("Records").

(e)    Personal Property. All equipment, machinery, tools, supplies and spare parts and all other tangible personal property now owned by Seller and situated on the



Real Property and used in connection therewith, if any, identified on Exhibit C attached hereto (the "Personal Property").

(f)     Licenses. Any permits, certificates of occupancy, approvals or other governmental authorizations owned or possessed by Seller with regard to the operation of the Real Property ("Licenses").

1.2     Purchase Price.

(a)     The purchase price for the Property is Three Million One Hundred Thousand and No/100 Dollars ($3,100,000.00) (the "Purchase Price").

(b)     The Purchase Price will be paid as follows:

(1)     Deposit. Within three (3) business days after the Effective Date, Buyer shall deposit in escrow with Seller, the amount of Ten Thousand Dollars ($10,000) (the "Deposit") pursuant to a separate Escrow Agreement between Buyer and Seller. Buyer will increase earnest money by an additional $ 50,000 after satisfaction of all contingencies.

(2)     Balance. The balance of the Purchase Price of $3,040,000.00, subject to adjustments and prorations as provided herein, will be paid as follows:

(a)     Loan assumption or a new loan of approximately Two Million eight hundred thousand and No/100 Dollars. ($ 2,800,000.00).

(b)     Two Hundred forty thousand ($ 240,000) to be paid by cash or wire transfer on the day of closing.

## ARTICLE 2

## REVIEW AND INSPECTIONS

2.1     Property Information to be Delivered. Within five (5) business days after the Buyer has paid the Deposit, Seller will provide Buyer with copies of all of the following (herein collectively the "Property Information"):

(a)     A current Rent Roll

(b)     Copies of government permits, licenses, certificates of occupancy.

(c)     A copy of all service or maintenance contracts currently in effect with respect to the Property (collectively, "Service Contracts").

(d)     Copy of real estate tax bills for the Property for taxes payable in current year

((i)     A copy of any appraisal done in connection with the Property (defined below).

Once Seller has provided Buyer with all of the Property Information as listed above, Seller will provide Buyer with a written notice confirming such delivery (herein "Seller's Delivery Notice").

2.2     Buyer's Inspections and Review. From the date hereof through the Closing, subject at all times to the rights of the tenants under the Leases ("Tenants"), Buyer or its agents may make inspections, tests, surveys, audits or reviews of the Property, all at Buyer's sole cost and expense. Seller will allow Buyer and its agents reasonable access, upon such prior notice, to the Property for said inspections. Buyer agrees to repair any physical damage to the Property caused by Buyer's activities under this Section, which obligation of Buyer will survive any termination of this Agreement. In addition, upon reasonable advance notice by Buyer, Seller will make all of the Licenses, Documents and Records.

2.3     Indemnity. Whether or not the transaction contemplated hereunder should close, except as specifically provided for herein, Buyer agrees to pay all costs and expenses incurred by Buyer for work requested by Buyer in performing any tests, inspections, audits or review of the Property or the books and records related to the Property. Such costs and expenses will include, without limitation, any engineering costs, architect's fees, accounting fees, Buyer's legal fees, appraisal fees, and inspection or testing costs.

Buyer will indemnify and hold Seller and Seller's Manager harmless from and against any actual out-of-pocket costs, damages, liabilities, losses, expenses, liens or claims (including, without limitation, court costs and reasonable attorneys' fees and disbursements) arising out of or relating to: (i) Buyer's failure to pay any of the foregoing costs, or (ii) any damage caused by entry on the Property by Buyer, its agents, employees or contractors in the course of performing the inspections, testings or inquiries provided for in this Agreement. This indemnity will survive the termination of this Agreement.

ARTICLE 3

CONDITIONS

3.1     Buyer Contingencies. Buyer's obligations to Close and purchase the Property are contingent upon the waiver or satisfaction of each of the following conditions precedent on or before the first business day which is 20 days after the date of Seller's Delivery Notice is referred to herein as the "Contingency Date."

(a)     Inspection. No later than the Contingency Date, Buyer will have determined, based on the inspections and reviews provided in Section 2.2, and the review of the Property Information provided under Section 2.1, that the Property is acceptable to Buyer, in its sole and absolute discretion.

(b)     Environmental. No later than the Contingency Date, based upon the Phase I Report, and based upon any other environmental assessments and studies of the Property as deemed necessary by Buyer, Buyer will have determined that the environmental condition of the Property is acceptable to Buyer, in its sole and absolute discretion.

(c)     Financing. On or before the Contingency Date, Buyer will have obtained

financing with terms acceptable to Buyer from Commerce Bank, in Buyer's sole and absolute discretion.

3.2     Cooperation. Seller and Buyer agree to use their good faith efforts to cooperate with and assist each other in attempting to satisfy each of the foregoing contingencies.

3.3     Approval; Non-Satisfaction.

(a)     Waiver. Buyer may waive the satisfaction of the contingencies in Sections 3.1, in Buyer's sole discretion.

(b)     Cancellation. If at any point prior to the end of the Contingency Period Buyer determines that any one of the contingencies specified in Section 3.1 above will not be satisfied prior to the expiration of the Contingency Period, then Buyer may, by written notice to Seller, cancel and terminate the Purchase Agreement ('Buyer's Cancellation Notice") and, upon the delivery of the Buyer's Cancellation Notice, the Deposit previously paid by Buyer will be refunded to Buyer, and the parties will be mutually released from all liabilities and obligations hereunder, save and except that Buyer will promptly return to Seller all copies of the Property Information provided to Buyer.

(c)     Buyer's Approval/Non-Approval. Buyer's failure to deliver the Buyer's Cancellation Notice will be deemed to be Buyer's delivery of Buyer's Cancellation Notice

ARTICLE 4

SELLER'S WARRANTIES

4.1     Representations and Warranties of Seller. Subject to the limitations, exceptions and exclusions set forth below, Seller hereby makes the following representations and warranties to Buyer (herein collectively the "Seller's Warranties").

(a)     This Agreement has been, and all documents executed by Seller which are to be delivered to Buyer at Closing will be, duly authorized, executed and delivered by Seller, and this Agreement does not and such other document will not violate any provision of any agreement or judicial order to which Seller is a party or to which Seller or the Property is subject.

(b)     Seller has been duly organized, is validly existing and is in good standing in Minnesota, and is qualified to do business in Minnesota. Seller has the power and authority to enter into this Agreement and all documents executed by Seller which are to be delivered to Buyer at Closing and to perform its obligations hereunder and thereunder.

(c)     The only Leases in force for the Property are the Leases to the Current

Tenants.

(d)     There are no Service Contracts in effect for the Property which will survive Closing.

(e)     Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended and any related regulations.

(f)     There is no governmental proceeding (including, but not limited to any condemnation proceeding) pending or threatened with respect to the Property, or with respect to Seller which impairs Seller's ability to perform its obligations under this Agreement.

(g)     Seller has received no notice from any governmental authority of any violation of any law applicable to the Property.

(h)     There are no wells or septic systems located on the Property to the best of Seller's knowledge.

(i)     The Property does not contain any Hazardous Materials in violation of any Environmental Laws.

4.2 Representations and Warranties of Buyer. Buyer represents and warrants to Seller as follows:

(a)     Buyer represents and warrants to Seller that this Agreement and all documents executed by Buyer which are to be delivered to Seller at Closing do not and at the time of Closing will not violate any provision of any agreement or judicial order to which Buyer is a party or to which Buyer is subject.

(b)     Buyer has been duly organized, is validly existing and is in good standing in the state in which it was formed, and is qualified to do business in the state in which the Real Property is located. This Agreement has been, and all documents executed by Buyer which are to be delivered to Seller at Closing will be, duly authorized, executed and delivered by Buyer.

5.1     Commitment. Seller, at Seller's sole cost and expense, will promptly cause to be furnished to Buyer a current title commitment ("Commitment") for an ALTA Form B Owner's Title Policy issued by the Title Company, showing the status of title of the Real Property and all exceptions, including liens, encumbrances, easements, restrictions, rights-of-way, covenants, reservations and other conditions, if any, affecting the Real Property which will appear in a Title Policy, if issued, and committing to issue such Title Policy to Buyer in the full amount of the Purchase Price at the Closing. Accompanying such title commitment, Seller will cause the Title Company to furnish Buyer with legible copies of all documents affecting the Property and referred to in the Commitment.

5.2     Survey. Within thirty (30) days after the Effective Date, Seller will have any existing survey of the Real Property updated and recertified ("Survey"), at Seller's sole cost and expense, and delivered to Buyer. The Survey will include the surveyor's unqualified certification to Buyer, Seller, and the Title Company, dated subsequent to the date of this Agreement confirming that such Survey has been prepared in full compliance with the most recent Survey Standards of the ALTA and ACSM.

5.3     Title Objections. If the Commitment or the Survey shows exceptions or defects to which Buyer does not consent, Buyer will provide Seller with written notice of the objections to title raised by such matters on the latter to occur of the expiration of the Contingency Date or the date that is fifteen (15) days after Seller's receipt of the last of the Commitment, exception documents, and the Survey. Buyer's failure to make such objections within said period will constitute a waiver by Buyer of any objections to the Commitment or Survey; provided that Buyer will be permitted to raise as title and survey objections (within five (5) business days of Buyer's notification thereof), matters affecting title which are first notified to Buyer by an amendment, update or continuation of the Commitment or Survey. If Buyer does timely provide written notice to Seller of objections to title as disclosed by the Commitment (or update as aforesaid) or Survey, then Seller will have ten (10) days after Buyer makes written objection to Seller to cure such defects. Seller will be deemed to have duly cured any such defects in title if Seller causes the title company to agree to provide Buyer, at Closing (at no cost to Buyer), with specific title insurance insuring Buyer over any loss occasioned by such defects. Seller will satisfy any liens, judgments or mortgages against the Property simultaneously with Closing by using proceeds from the sale. If Seller has not been able to cure such title defects within thirty (30) days from the date of written objection thereto, as above provided, and Buyer does not waive the curing of such defects, then, at Buyer's option (i) this Agreement will be voidable upon written notice by Buyer to Seller, in which event the Deposit and interest earned thereon will be immediately refunded to Buyer, or (ii) this Agreement will remain in effect, Buyer may cure or correct any exceptions or defects to which it has objected, and the costs of such cure or correction (including reasonable attorneys' fees and costs) will be deducted from the Purchase Price at Closing. If Buyer elects option (ii) above, the Closing will be postponed for a period of up to sixty (60) days to enable Buyer to make such cures or corrections.

# ARTICLE 6

## RISK OF LOSS AND INSURANCE PROCEEDS

6.1     Casualty. The risk of loss or damage or destruction to the Real Property by fire or other casualty is retained by Seller until the Closing. In the event of fire or other casualty, Seller will immediately notify Buyer thereof and then Buyer will have the option, exercisable within fifteen (15) days of Seller's notice, of either (i) declaring this Agreement terminated in which event Title Company will refund to Buyer, with the interest earned thereon, the Earnest Money whereupon this Agreement and all rights of Buyer hereunder and to the Real Property will terminate and neither Seller nor Buyer will have any further claim against the other; or (ii) "Closing" in accordance with this Agreement and paying in full the Purchase Price, without any abatement thereof or claim against Seller for such loss or damage (except solely that Seller will credit the purchase price by the amount of its insurance deductible), and Buyer accepting an assignment of Seller's rights, to any payments to be made under any applicable hazard insurance policies together with any payments under such policies made to Seller prior to the Closing and not expended to repair or replace such loss, damage or destruction. If Buyer will have failed to timely make an election pursuant to the foregoing sentence Buyer will be deemed to have elected to terminate this Agreement in accordance with (i) above. This paragraph will govern to the extent inconsistent with any applicable law.

6.2     Condemnation. If prior to the Closing, all of the Property is taken by condemnation, eminent domain or deed in lieu thereof or if such a taking is threatened in writing by the applicable governmental authority having jurisdiction over the Property, this Agreement will be automatically canceled, the Earnest Money together with any interest thereon will be returned to Buyer and thereupon neither party will have any further liability or obligation to the other. Seller agrees not to deliver a deed in lieu or its equivalent without the prior written consent of Buyer. If prior to the Closing date, (a) a portion, but less than all, of the Property is taken by condemnation, eminent domain or deed in lieu thereof, or (b) there is any taking of the land lying in the bed of any street, road, highway or avenue open or proposed, in front of or adjoining all or any part of the Property, (c) there is any change of grade of any street, road, highway or avenue, or (d) a taking described in (a), (b) or (c) above is threatened in writing by the applicable governmental authority having jurisdiction over the Property, then in any of such events Buyer may cancel this Agreement by sending written notice thereof to Seller within thirty (30) days of Buyer's receipt of notice of such condemnation, eminent domain, change of grade or other taking, in which event the Title Company will return to Buyer the Earnest Money with interest thereon and thereupon neither party will have any further liability or obligations to the other. If this Agreement is not canceled Buyer will accept title to the Property subject to the pending or threatened condemnation, eminent domain, taking or change of grade, in which event on the Closing Date the net proceeds of the award or payment (after payment of all actual, reasonable, out-of-pocket collection costs) will be assigned by Seller to Buyer and net monies theretofore received by Seller in connection with such condemnation, eminent domain, taking or change of grade will be paid over to Buyer or allowed as a credit against the purchase price hereunder.

## ARTICLE 7

## OPERATIONS

8.1     Ongoing Operations. During the pendency of this Agreement, but subject to the limitations set forth below, Seller will carry on its businesses and activities relating to the Real Property substantially in the same manner as it did before the date of this Agreement.

8.2     New Contracts/Leases. Following the Effective Date, Seller will not enter into any leases or contracts that could create an obligation affecting the Real Property subsequent to the Closing, without the prior written consent of the Buyer.

8.3     Assigned Contracts. Prior to expiration of the Contingency Period, Buyer will inform Seller which, if any, of the Service Contracts that Buyer may assume at Closing. Any Service Contracts not assumed by Buyer at Closing will be terminated by Seller, at Seller's expense, immediately prior to Closing.

8.4     Existing Leases. Following the Effective Date, Seller will not terminate any existing leases or contracts without the prior written consent of the Buyer.

## ARTICLE 8

## CLOSING

9.1     Closing Date. Provided that all conditions thereto have been satisfied, the consummation of the sale and purchase contemplated hereby will be held on a date specified by Buyer to Seller, but may not be later than thirty (30) days after the Contingency Date. The Closing will take place in escrow through the offices of the Title Company. The date and hour of Closing are herein referred to as the "Date of Closing" or the "Closing."

9.2     Seller's Closing Documents. Seller will deliver to Buyer at Closing all of the following items:

(a)     A properly executed and acknowledged recordable Warranty Deed conveying marketable title to the Property to Buyer subject only to the exceptions to title showing in the Commitment and Survey which have been accepted by Buyer.

(b)     A Bill of Sale duly executed and acknowledged by Seller, conveying to Buyer title to any Personal Property.

(c)     Executed affidavits in the customary form stating that there are no liens, judgments, mechanic liens, bankruptcies, etc. which affect the Property.

(d)     A sworn statement that Seller is not a foreign person and containing such

other information as may be required by Section 1445 of the Internal Revenue Code and regulations thereunder.

(e)    An Assignment and Assumption of the Leases in a form reasonably acceptable to Seller and Buyer ("Lease Assignment") with a current Rent Roll attached, together with the original Leases and all Tenant files. At the Closing, Seller will either transfer (i) any Security Deposits, and (ii) any overpayments or prepayments of rent, or of common area maintenance, real estate taxes and insurance by Tenants to Buyer, or, at Buyer's option, will grant Buyer a credit against the cash portion of the Purchase Price in an amount equal to such amounts as of the Closing Date.

(f)    A notice to all Tenants advising them of the sale of the Property, advising them of Buyer's assumption of the Landlord's obligations with respect to any Security Deposit, and directing all Tenants to make future rent payments to Buyer at a place designated by Buyer.

(g)    An Assignment (the "General Assignment") in a form reasonably acceptable to Seller and Buyer by which Seller will assign to Buyer, and Buyer will assume: (i) all guaranties and warranties made by any contractor, subcontractor, materialman, supplier, or other person or entity with respect to the Improvements; (ii) the Services Contracts to be assumed by Buyer; (iii) the Documents; (iv) the Records; and (v) the Licenses.

(h)    Any required 1099 Form.

(i)    A termination and release executed by a duly authorized officer of Seller's Manager terminating its management agreement and all management and leasing rights with respect to the Property as of the Closing Date, and by which Seller release Seller's Manager from all liability and claims with respect to the Property.

(j)    The Title Company's closing statement appropriately allocating the Purchase Price, Closing costs, and other items as specified herein.

(k)    A "Bring-Down Certificate" executed by Seller confirming and re-making each of Seller's Warranties as of the Closing.

(l)    Other documents reasonably required by the Title Company to consummate the transaction contemplated hereby.

9.3    Buyer's Closing Documents. Buyer will deliver to Seller at Closing all of the following items:

(a)    The cash payment required by Section 1.2 above, subject only to the prorations, credits and adjustments specified herein.

(b)    The Lease Assignment.

(c)    The General Assignment.

(d)    The Title Company's closing statements.

(e)    Such other and further documentation reasonably required by Seller.

9.4    Closing Costs. The following costs and expenses will be paid as follows in connection with the Closing:

(a)    Seller will pay:

(1)    The cost of preparation of the deed and other documents of conveyance.

(2)    State deed tax (and any other applicable transfer or similar taxes) upon delivery to Buyer of the deed.

(3)    Any filing fee to record the deed.

(4)    Seller's attorneys' fees.

(5)    The cost of obtaining and recording any document necessary to make title marketable.

(6)    One-half (2) of the Closing fee charged by the Title Company.

(7)    Such other costs as are allocated to Seller under this Agreement.

(b)    Buyer will pay:

(1)    Buyer's attorneys' fees

(2)    The premium or any owner's or lender's title insurance policy and endorsements or supplemental coverage obtained by Buyer.

(3)    All costs, fees and expenses incurred in connection with any financing obtained by Buyer.

(4)    One-half (2) of the Closing fee charged by the Title Company.

(5)    Such other costs as are allocated to Buyer under this Agreement.

9.5    Taxes and Special Assessments. At Closing, Seller will pay all levied or pending

special assessments for the Property as of the Closing Date, including any special assessments included within real estate taxes due and payable in 2008. Seller will also pay all general real estate taxes ("Taxes") due and payable for the Property in 2007 and in all years prior thereto. Seller and Buyer will pro-rate to the Closing on a per diem basis all Taxes payable in 2008, on the basis of a calendar year. Buyer will pay all Taxes payable in the years subsequent thereto.

9.6 Prorations. The following items will be prorated and apportioned as of the Closing Date: (i) Seller pay that part of operating costs and expenses incurred through the Closing Date, (ii) Seller shall receive all rent and other revenues paid by Tenant for periods up to and including the Closing Date, (iii) Buyer pays all operating expenses after the Date of Closing, and (iv) Buyer shall receive all revenues and rents from and after the Date of Closing. The items to be so pro-rated in accordance with the preceding are as follows:

(a) Operating expenses and Tenant escrow and/or payments for common area maintenance, real estate taxes, and insurance amounts;

(b) Premiums under assigned insurance policies, if any.

(c) Rents due and payable in the month the Closing occurs and any pre-paid rents.

(d) Payments under assigned and assumed Service Contracts, if any.

(e) Other prepaid expenses.

If on the Closing Date, the precise figures necessary for any of the foregoing adjustments are not capable of determination, then those adjustments will be made on the basis of good faith estimates of Seller and Buyer using currently available information, and final adjustments will be made promptly after precise figures are determined or available.

9.7 Utilities. Seller will cause all meters for electricity, gas, water, sewer or other utility usage at the Property to be read on the Closing Date, and Seller will pay all charges for such utility charges which have accrued on or prior to the Closing Date. If the utility companies are unable or refuse to read the meters on the Closing Date, all charges for such utility charges to the extent unpaid will be prorated and adjusted as of the Closing Date based on the most recent bills therefore.

ARTICLE 10
MISCELLANEOUS

10.1 Remedies. If, after payment by Buyer of the Deposit, Buyer defaults in the performance of this Agreement, as its sole remedy, Seller may terminate this Agreement pursuant to Minn. Stat. 5559.21, and upon the completion of such termination, the Title Company will pay Seller the Deposit which Seller may retain as liquidated damages. If Seller defaults in the performance of this Agreement, in addition to attorneys' fees and costs as provided in Section

10.4 below and any other remedies at law or in equity, the Buyer may either (i) cancel and terminate this Agreement by written notice pursuant to Minn. Stat. 559.21, and upon the completion of such termination, the Title Company will pay Buyer all of the Deposit; or, (ii) as an alternative remedy to such cancellation, Buyer may apply for and receive a decree of specific performance against Seller to enforce performance of the terms hereof.

     10.2   Notices. Any notices required or permitted to be given hereunder will be given in writing and will be delivered (a) in person, (b) by facsimile transmission with confirmation of delivery, (c) by certified mail, postage prepaid, return receipt requested, or (d) by a commercial overnight courier that guarantees next business day delivery and provides a receipt, and such notices will be addressed as follows:

       To Buyer:       Syed M. Raza
                       1517 West Greendale
                       Park Ridge, IL 60068

       To Seller:       Newport Investments, LLC
                       3 Blue Spruce Court
                       North Oaks, MN 55127

or to such other address as either party may from time to time specify in writing to the other party. Any such communication, if mailed as provided herein, will be deemed to have been received on the expiration of four (4) business days after mailing. If sent by recognized overnight delivery service (i.e., Federal Express, UPS, etc.), such communication will be deemed to have been received on the first business day after the communication is sent by such means. If sent via facsimile, such communication will be deemed to have been given and received on the day indicated on the confirmed facsimile delivery transmission documentation. If the last day of a period within which either party is required or allowed to provide a notice, demand, offer, election, acceptance or other communication hereunder should fall upon a Saturday, Sunday or legal holiday then, the next full business day will be included in such period and such notice, offer, demand, request or communication may be made and given on such next full business day.

     10.3   Entire Agreement. This Agreement, together with the Exhibits and schedules hereto, contains all representations, warranties and covenants made by Buyer and Seller and constitutes the entire understanding between the parties hereto with respect to the subject matter hereof. Any prior correspondence, memoranda or agreements are replaced in total by this Agreement together with the Exhibits and schedules hereto.

     10.4   Attorneys' Fees. If either party hereto fails to perform any of its obligations under this Agreement or if any dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Agreement, then the defaulting party or the party not prevailing in such dispute, as the case may be, will pay any and all reasonable costs and expenses incurred by the other party on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs and reasonable attorneys' fees and

disbursements.

10.5    Assignment. Buyer may assign its rights under this Agreement without the consent of Seller, but no such assignment will relieve Buyer of any of its obligations hereunder.

10.6    Signatures in Counterparts and By Facsimile. The undersigned agree that this instrument may be signed in any number of counterparts, each of which will constitute an original, and that a facsimile copy of any signature of any party will be deemed as enforceable and effective as an original signature. All such counterparts together will constitute one and the same instrument.

10.7    Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of Minnesota.

10.8    Amendments. This Agreement may be amended or modified only by a written instrument signed by Buyer and Seller.

10.9    No Third Party Beneficiary. The provisions of this Agreement are not intended to benefit any third parties.

10.10   Exchange. Seller acknowledges that Buyer may identify the Property as a replacement property for purposes of a deferred exchange under Section 1031 of the Federal Internal Revenue Code, as amended. If Buyer should exercise its right to cause this transaction to qualify for exchange treatment under said Section 1031, then Seller will cooperate in good faith and enter into such other and further documents, instruments and agreements, including, without limitation, an exchange agreement, designation of a third party escrow agent, escrow agreements, closing agreements, consent to an assignment by Buyer under this Purchase Agreement to a third party escrow agent, and other such documents, agreements and instruments as may be necessary or appropriate to cause the transaction hereunder to qualify for such deferred recognition of gain as an exchange under and in accordance with Section 1031 and the regulations adopted thereunder. However, Seller will not be required to incur any additional costs or assume any additional liabilities by reason of the foregoing.

10.11   **AS-IS CONVEYANCE.** The Property is expressly purchased and sold "AS IS," "WHERE IS," and "WITH ALL FAULTS." The Purchase Price and the terms and conditions set forth herein are the result of arm's-length bargaining between entities familiar with transactions of this kind, and said price, terms and conditions reflect the fact that Buyer shall have the benefit of, and, except as provided in Article 4.1 herein, is not relying upon, any information provided by Seller or statements, representations or warranties, express or implied, made by or enforceable directly against Seller, including, without limitation, any relating to the value of the Property, the physical or environmental condition of the Property, any state, federal, county or local law, ordinance, order or permit; any insurance binder, survey, appraisal, environmental report or other contract or document provided by Seller, the suitability, compliance or lack of compliance of the Property with any regulation, or any other attribute or matter of or relating to the Property (other than any covenants of title). Except as otherwise provided in this Agreement, Buyer

agrees that Seller shall not be responsible or liable to Buyer for any defects, errors or omissions, or on account of any conditions affecting the Property. Buyer, its successors and assigns, and anyone claiming by, through or under Buyer , except as otherwise provided in this Agreement, hereby fully releases Seller and its officers, agents and assigns ("Seller's Indemnified Parties") from, and irrevocably waives its right to maintain, any and all claims and causes of action that it or they may now have or hereafter acquire against Seller's Indemnified Parties with respect to any and all claims and causes of action arising from or related to any defects, errors, omissions or other conditions affecting the Property. Buyer represents and warrants that, as of the date hereof and as of the closing date, it has and shall have reviewed and conducted such independent analyses, studies (including, without limitation, environmental studies and analyses concerning the presence of lead, asbestos, PCBs and radon in and about the Property), reports, investigations and inspections as it deems appropriate in connection with the Property. If Seller provides or has provided any documents, summaries, opinions or work product of consultants, surveyors, architects, engineers, title companies, governmental authorities or any other person or entity with respect to the Property, Buyer and Seller agree that Seller has done so or shall do so only for the convenience of both parties, Buyer shall not rely thereon and the reliance by Buyer upon any such documents, summaries, opinions or work product shall not create or give rise to any liability of or against Seller's Indemnified Parties. Buyer acknowledges and agrees that no representation has been made and no responsibility is assumed by Seller with respect to current and future applicable zoning or building code requirements or the compliance of the Property with any other laws, rules, ordinances or regulations, the financial earning capacity or expense history of the Property, the continuation of contracts, continued occupancy levels of the Property, or any part thereof, or the continued occupancy by tenants of any leases or, without limiting any of the foregoing, occupancy at closing. Prior to closing, Seller shall have the right, but not the obligation, to enforce its rights against any and all Property occupants, guests or tenants. Buyer agrees that subject to the terms and conditions of Article 8, the departure or removal, prior to closing, of any of such guests, occupants or tenants shall not be the basis for, nor shall it give rise to, any claim on the part of Buyer, nor shall it affect the obligations of Buyer under this contract in any manner whatsoever; and Buyer shall, if Buyer has not otherwise terminated this contract, close title and accept delivery of the deed with or without such tenants in possession and without any allowance or reduction in the Purchase Price under this contract. Buyer hereby releases Seller from any and all claims and liabilities relating to the foregoing matters.

[SEPARATE SIGNATURE PAGES ATTACHED]

SIGNATURE PAGE
TO
PURCHASE AGREEMENT

(Forest Lake Apartments Housing Associates, LLC.)

The parties hereto have executed this Agreement as of the Effective Date set forth in the first paragraph of this Agreement.

SELLER:                Newport Investments, LLC
                       A Minnesota Liability Company


                       By:_____
                           Hyder Jaweed
                           Its: Chief Manager


BUYER:                 Syed M. Raza


                       By:_____

# EXHIBIT A

## REAL PROPERTY DESCRIPTION

## ``EXHIBIT B

## LIST OF LEASES/RENT ROLL

## EXHIBIT C

## PERSONAL PROPERTY LIST

# Newport Investments, LLC
## (3002781)
TENANT INFO

| Building | Unit | Name | Rent | Garage | (Rent Credit) |
|---|---|---|---|---|---|
| 1624 | 1B | Diane Vang & Ken Ly (as of 3/1/10) | $ 740.00 | $ - | $ - |
| 1624 | 2B | Chad Wilmes | $ 740.00 | $ - | $ - |
| 1624 | 3B | Audrey Walsh (moved out 8/31/10?) | $ 620.00 | $ - | $ - |
| 1624 | 4B | Leila Jelinek (as of July 2010) | $ 740.00 | $ - | $ - |
| 1624 | 5B | John George | $ 740.00 | $ 35.00 | $ - |
| 1624 | 6B | Maxwell Akoh-Onoja | $ 555.00 | $ - | $ - |
| 1624 | 1 | Tim Bertheaume | $ 740.00 | $ 70.00 | $ - |
| 1624 | 2 | Brooke McMahon (moved out 6/30/10) | $ 740.00 | $ - | $ - |
| 1624 | 3 | Richard Barrett | $ 620.00 | $ 35.00 | $ - |
| 1624 | 4 | Katie Babcock & Matthew Holmes | $ 620.00 | $ - | $ - |
| 1624 | 5 | Cheryl Doble (moved out 8/31/10) | $ 760.00 | $ - | $ - |
| 1624 | 6 | Cynthia Aguilera (moved out 6/30/10) | $ 740.00 | $ - | $ - |
| 1624 | 7 | Lindsey Loun | $ 675.00 | $ - | $ - |
| 1624 | 8 | Dan Gardner | $ 740.00 | $ 35.00 | $ - |
| 1624 | 9 | Shalee Sand | $ 620.00 | $ 35.00 | $ - |
| 1624 | 10 | William Shoup | $ 620.00 | $ - | $ - |
| 1624 | 11 | ▓▓▓▓▓▓▓ | $ 740.00 | $ - | $ - |
| 1624 | 12 | Rosetta & Rita Williams | $ 765.00 | $ 35.00 (as of 6/1/10) | $ - |
| | | | | | |
| 1650 | 1B | Kirstin Purcell & Jeff Thompson | $ 740.00 | $ 70.00 | $ 225.00 |
| 1650 | 2B | Lee Xiong | $ 740.00 | $ - | $ - |
| 1650 | 3B | Brian Young | $ 620.00 | $ 35.00 | $ - |
| 1650 | 4B | ?? (was previously Renae Walsh who moved to 1650 #6) | $ 740.00 | ?? | |
| 1650 | 5B | Matt & Nathan Wilmes | $ 675.00 | $ 35.00 | $ - |
| 1650 | 6B | ▓▓▓▓▓▓▓ | | $ - | $ - |
| 1650 | 1 | Danielle Krahn | $ 740.00 | $ 35.00 | $ - |
| 1650 | 2 | Sean Thiery - since 5/1/10 (was previously Jennifer Jones & Steve Howard) | $ 740.00 | $ 35.00 | $ - |
| 1650 | 3 | Alexander Galchutt (was previously Brittany Olson 3-1-10) | $ 555.00 | $ - | $ - |
| 1650 | 4 | Silas Klusalu Walndkin - since 5/1/10 (was previously Sean Thiery) | $ 620.00 | $ 35.00 | $ 200.00 |
| 1650 | 5 | Vacant ▓▓▓▓▓▓▓ | $ 675.00 | $ - | $ - |
| 1650 | 6 | Renae Walsh - since 7/1/10 (was previously Kathleen Cook who moved to 1650 #11) | $ 740.00 | $ 70.00 | $ 810.00 |
| 1650 | 7 | Misty Williams | $ 740.00 | $ - | $ - |
| 1650 | 8 | Edith Jarvis | $ 740.00 | $ 70.00 | $ ? |
| 1650 | 9 | Kristy Williams as of 07/01/10 (was previously Alyssa Ricci) | $ 620.00 | $ - | $ - |
| 1650 | 10 | Sara DeRoche | $ 620.00 | $ 35.00 | $ - |
| 1650 | 11 | Kathleen Cook - since 7/1/10 (was previously Eric Wilson) | $ 740.00 | $ 35.00 | $ - |
| 1650 | 12 | Kristy Ridley | $ 740.00 | $ 35.00 | $ - |
| | | ▓▓▓▓▓▓▓ | | | |
| 1660 | 1B | Nicole & Daniel Wick | $ 740.00 | $ - | $ - |
| 1660 | 2B | David Berke | $ 740.00 | $ 70.00 | $ 810.00 |
| 1660 | 3B | Andy Hophan | $ 620.00 | $ 35.00 | $ - |
| 1660 | 4B | Jason Throener | $ 740.00 | $ 35.00 | $ - |
| 1660 | 5B | Brad & Melissa Ingemann | $ 750.00 | $ 35.00 | $ - |
| 1660 | 6B | Jody Glime | $ 585.00 | $ - | $ 200.00 |
| 1660 | 1 | Laura Nelson | $ 740.00 | $ - | $ - |
| 1660 | 2 | Geda/Woldegiorgis - since 6/1/10 (was previously Eileen Gregory) | $ 740.00 | $ - | $ - |
| 1660 | 3 | Steven Lund - since 8/1/10 (was previously Doug Gerlach) | $ 620.00 | $ 35.00 | $ - |
| 1660 | 4 | Natalie Jones & Anthony McClellon | $ 620.00 | $ - | $ - |
| 1660 | 5 | Diane Ruiz | $ 740.00 | $ - | $ - |
| 1660 | 6 | Karen Fillion | $ 740.00 | $ 35.00 | $ - |
| 1660 | 7 | Gillian Pearson as of 07/01/10 (was previously Pugsly & Torrence) | $ 740.00 | $ 35.00 | $ - |
| 1660 | 8 | Qwendolyn Townsend (3-13-10) | $ 740.00 | $ - | $ - |
| 1660 | 9 | Tim Jones | $ 620.00 | $ - | $ - |
| 1660 | 10 | Mike Pledger - since 7/1/10 (was previously Benjamin Goeden) | $ 620.00 | $ - | $ - |
| 1660 | 11 | Paul Snyder (3-5-10) | $ 695.00 | $ - | $ - |
| 1660 | 12 | Vacant ▓▓▓▓▓▓▓ | $ 675.00 | $ - | $ - |
| | Total | | $ 36,735.00 | $ 980.00 | $ 2,245.00 |

+less  -
37,715 "Parl'"

EXHIBIT
E
tabbies®

▓▓▓▓▓▓▓
35,470   net of credits



In re:                                                              Case No. 10-47910

Newport Investments, LLC                                           Chapter 11 Case

## Order for Dismissal Under 11 U.S.C. § 1112(b)

This case came before the court on the motion of Commerce Bank seeking

dismissal of the debtor's Chapter 11 case under 11 U.S.C. § 1112(b)(4)(A) and on the

grounds that debtor filed bankruptcy in bad faith.

It is ordered that the debtor's Chapter 11 case is DISMISSED.

Dated:

_____
Robert J. Kressel
United States Bankruptcy Judge

1

# CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2011, I caused the following documents:

**Notice of Hearing and Moton to Dismiss under 11 USC § 1112(b)**
**Memorandum in Support of Dismissal under 11 USC § 1112(b)**
**Declaration of Richard G. Jensen**
**Declaration of Brian Mallak**
**Proposed Order**

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an e-notice of the electronic filing to the following:

SEE ATTACHED

I further certify that I caused a copy of the foregoing documents and the notice of electronic filing to be mailed by first class mail, postage prepaid, as indicated on the attached service list.

Carolyn Lindabaur

Subscribed and sworn to before me this
9th day of February, 2011.

Notary Public

KAREN B. LOEWECKE
Notary Public-Minnesota
My Commission Expires Jan 31, 2015

Newport Investments, LLC – Bky No. 10-47910
Forest Lake Apartments Housing Associates, LLC – Bky No. 10-47911
**Service List**

Served via US Mail, except those parties whose
contact information does not include e-mail address were served via CM/ECF or email

| US Trustee and Other Required Parties | Hyder R. Jaweed<br>3 Blue Spruce Court<br>North Oaks, MN 55127 | City of Newport<br>596 7th Street<br>Newport, MN 55055 |
|---|---|---|
| U.S. Trustee's Office<br>1015 US Courthouse<br>300 S Fourth Street<br>Minneapolis, MN 55415<br>ustpregion12.mn.ecf@usdoj.gov | Newport Investments, LLC<br>3853 Central Ave NE<br>Minneapolis, MN 55421<br><br>**Debtor's Creditors** | Integra Telecom<br>1201 N.E. Lloyd Blvd.<br>Suite 500<br>Portland, OR 97232-1259 |
| Michael Fadlovich<br>1015 US Courthouse<br>300 S. Fourth Street<br>Minneapolis, MN 55415<br>michael.fadlovich@usdoj.gov | Commerce Bank<br>7650 Edinborough Way, #150<br>Edina, MN 55435 | Rent.com<br>Dept. 1987<br>PO Box 1987<br>Los Angeles, CA 90084-1987 |
| IRS District Counsel<br>380 Jackson St., Ste 650<br>St. Paul, MN 55101-4804 | City of Forest Lake<br>220 N. Lake Street<br>Forest Lake, MN 55025 | **Other Interested Parties** |
| MN Department of Revenue<br>Collection Enforcement<br>551 Bankruptcy Section<br>600 North Robert Street<br>PO Box 64447<br>St. Paul, MN 55101-2228 | Bank Mutual<br>4949 W. Brown Deer Road<br>PO Box 245034<br>Milwaukee, WI 53224-9534 | Nell E. Matthews<br>Lindquist & Vennum<br>4200 IDS Center<br>80 S 8th Street<br>Minneapolis, MN 55402-2274<br>nmathews@lindquist.com |
| US Attorney<br>600 US Courthouse<br>300 S Fourth Street<br>Minneapolis, MN 55415 | Qwest<br>100 S 5th Street<br>Suite 1075<br>Minneapolis, MN 55402 | Clinton E. Cutler<br>Fredrikson & Byron, P.A.<br>4000 Pillsbury Center<br>200 South Sixth Street<br>Minneapolis, MN 55402-1425<br>ccutler@fredlaw.com<br>Attorney for Debtor |
| Minnesota Department of<br>Economic Security<br>332 Minnesota Street<br>St. Paul, MN 55101-1351 | Walters<br>PO Box 67<br>Circle Pines, MN 55014 | Cynthia A. Moyer<br>Fredrikson & Byron, P.A.<br>4000 Pillsbury Center<br>200 South Sixth Street<br>Minneapolis, MN 55402-1425<br>Attorney for Debtor<br>cmoyer@fredlaw.com |
| **Debtors** | Washington County<br>14949 62nd St. N.<br>PO Box 200<br>Stillwater, MN 55082-0200 | |
| Forest Lake Apts Housing<br>Assoc, LLC<br>3853 Central Ave NE<br>Minneapolis, MN 55421 | Xcel Energy<br>PO Box 9477<br>Minneapolis, MN 55484-9477 | |